[S. F. No. 19395.   In Bank—July 2, 1897.]

ABRAHAM KLAUBER ET AL., APPELLANTS, *v.* T. J. HIGGINS ET AL., RESPONDENTS.

PUBLIC LANDS—AUTHORITY FOR DISPOSAL—DISTINCTION BETWEEN GENERAL AND SPECIAL RESERVATION—DETERMINING CHARACTER OF LAND—ABSENCE OF AUTHORITY—VOID PATENT.—Where a large body of public lands is subjected to sale or disposition under a law which has merely a general reservation of such lands, as may be found to be of a certain character, the land department has jurisdiction to determine the character of any part of the land, and a patent therefor is conclusive evidence that such jurisdiction has been exercised; but where there is a special and unconditional reservation of certain lands from sale, and there is no law authorizing an investigation of their character, or permitting their sale under any conditions, a patent therefor is without authority of law and void, and is assailable collaterally from any quarter.

ID.—SPECIAL RESERVATION OF STATE LANDS—LIMITS OF TWO MILES FROM TOWN OR VILLAGE—VOID PATENT OF SAN DIEGO TIDE LANDS. Under the amendment of April 4, 1870, to section 70 of the act for the management and sale of state lands, approved March 28, 1868, all swamp and overflowed, salt marsh and tide lands within two miles of any town or village were excluded from the provisions of the act, and specially reserved from sale or other disposition; and a patent for tide lands situated within two miles from the town or city of San Diego, issued subsequent to that amendment without any vested right existing prior thereto, is without authority of law, and void.

ID.—APPLICATION PRIOR TO AMENDMENT—RIGHTS NOT VESTED.—The mere fact that applications for the purchase of tide lands reserved from sale by the amending act of 1870, were made prior to its passage, where such applications were not approved, and no payments were made thereon prior to its passage, does not confer any vested right, or constitute any contract with the state, and any patent thereafter granted under such applications is void.

ID.—CONSTRUCTION OF STATUTE—"TOWN" INCLUSIVE OF "CITY."—The term "town," used in fixing the limit within which there is an exclusion and reservation of state lands from sale, in the amending act of April 4, 1870, is used generically, and is inclusive of "city," there being nothing in the act to show that a narrower meaning was intended.

ID.— CONSTRUCTION OF LEGALIZING ACT— LANDS NOT SUBJECT TO SALE
NOT INCLUDED.—The act of May 27, 1872, legalizing applications for
the purchase of state swamp and overflowed, and salt marsh and tide·
lands, notwithstanding any misdescription in the style or character of
the land, was merely designed to legalize applications for lands which
were subject to sale, and it was not the purpose of the act to offer for
sale lands not subject to sale under the general law, and it does not
apply to lands specially reserved from sale thereunder.

ID.—POSSESSOR OF LAND MAY ASSAIL VOID PATENT.—One in possession
of land is always in position to contest the right of another claiming
under a void patent.

ID.—RIGHTS OF BOARD OF HARBOR COMMISSIONERS.—The board of harbor
commissioners for the bay of San Diego are connected with the right of
the state to tide lands within two miles of San Diego, and may assail a
void patent thereof.

APPEAL from a judgment of the Superior Court of
San Diego County and from an order denying a new
trial. GEORGE PUTERBAUGH, Judge.

The facts are stated in the opinion of the court.

*Stephen M. White, Henry M. Willis,* and *Aitken &
Smith,* for Appellants.

The state owned and could dispose of its tide lands
by patent. (*Shively* v. *Bowlby,* 152 U. S. 1; *Bowlby* v.
*Shively,* 22 Or. 415, 416; *Knight* v. *United Land Assn.,*
142 U. S. 183–4; *San Francisco* v. *Le Roy,* 138 U. S.
656; *Pacific Gas Imp. Co.* v. *Ellert,* 64 Fed. Rep. 421; *Ho-
boken* v. *Pennsylvania R. R. Co.,* 124 U. S. 656; *Weber*
v. *State Harbor Commrs.,* 18 Wall. 57.) The city of
San Diego owns no land below ordinary high-water
mark, and has no interest in, or title to, any tide lands.
(*San Diego* v. *Allison,* 46 Cal. 162; *San Diego* v. *Granniss,*
77 Cal. 516; *United States* v. *Pacheco,* 2 Wall. 587; *San
Francisco* v. *Le Roy, supra.*) San Diego is not a " town,"
within the exceptions of the act of April 4, 1871, but it
is a " city," with respect to which no exception is made
in that act. (Stats. 1867–8, p. 534; Stats. 1869–70, p.
299.) No one who is not in privity with the para-
mount source of title, can assail the patent from the
state to the appellants. (*Zummwalt* v. *Dickey,* 92 Cal.
158; *Hebbron* v. *Graves,* 78 Cal. 380; *Leviston* v. *Ryan,*

75 Cal. 293; *Foss* v. *Hinkell,* 78 Cal. 158; *Burling* v. *Thompkins,* 77 Cal. 261; *Doll* v. *Meador,* 16 Cal. 295; *Rhodes* v. *Craig,* 21 Cal. 419; *People* v. *Stratton,* 25 Cal. 251; *Grogan* v. *Knight,* 27 Cal. 520; *Carder* v. *Baxter,* 28 Cal. 101; *Hager* v. *Lucas,* 29 Cal. 312; *Megerle* v. *Ashe,* 33 Cal. 89; *Smith* v. *Athern,* 34 Cal. 512; *Toland* v. *Mandell,* 38 Cal. 33; *Hodapp* v. *Sharp,* 40 Cal. 71; *Hastings* v. *Devlin,* 40 Cal. 370; *Sherman* v. *Buick,* 45 Cal. 668; *Cruz* v. *Martinez,* 53 Cal. 243; *Churchill* v. *Anderson,* 56 Cal. 60; *Chapman* v. *Quinn,* 56 Cal. 278; *O'Connor* v. *Frasher,* 56 Cal. 505; *Montgomery* v. *Donnelly,* 57 Cal. 69; *Kentfield* v. *Hayes,* 57 Cal. 410.)  The patent is conclusive that the lands granted were tide lands.  (*Barden* v. *Northern Pac. R. R. Co.,* 154 U. S. 288; *Lake Superior etc. Co.* v. *Cunningham,* 155 U. S. 354; *Chandler* v. *Calumet etc. Co.,* 149 U. S. 79; *French* v. *Fyan,* 93 U. S. 169; *Martin* v. *Marks,* 97 U. S. 345; *Steel* v. *St. Louis etc. Co.,* 106 U. S. 451; *Campbell* v. *United States,* 107 U. S. 407; *Cohn* v. *Barnes,* 7 Saw. 52; *San Francisco Sav. Union* v. *Irvin,* 28 Fed. Rep. 708; *Pengra* v. *Munz,* 29 Fed. Rep. 834; *Shanklin* v. *McNamara,* 87 Cal. 371, 389; *Tubbs* v. *Wilhort,* 73 Cal. 61; *Howell* v. *Slauson,* 83 Cal. 546; *Lux* v. *Haggin,* 69 Cal. 342; *Montgomery* v. *Donnelly, supra; Cruz* v. *Martinez, supra.*)  The curative act of March 27, 1872, validates plaintiff's title.  (Stats. 1871–72, 622; *Rowell* v. *Perkins,* 56 Cal. 219; *Muller* v. *Casey,* 58 Cal. 542; *Upham* v. *Hosking,* 62 Cal. 250; *Johnson* v. *Squires,* 53 Cal. 37.)

*Lovy & Palmer,* and *George J. Lovy,* for the San Diego C. & E. Ry. Co., Respondents.

The lands in controversy between the meander line of the city of San Diego and high-water mark are within the limits of the city, and no state patent can convey them.  The waters, and not the meander line, constitute the real boundary of the city.  (*Hardin* v. *Jordan,* 140 U. S. 371.)  A patent is void where the grantor has no title.  (*Knight* v. *United Land Assn. etc.,* 142 U. S. 161.)

*Hunsaker, Britt & Goodrich,* and *E. W. Britt,* for Russ
Lumber and Mill Company, Spreckels Brothers Com-
mercial Company, *et al.* Respondents.

The boundary line of the city is not the meander
line, but the body of water whose line is meandered.
(*St. Paul etc. R. R. Co.* v. *Schurmeier,* 7 Wall. 272; *Hardin*
v. *Jordan,* 140 U. S. 380; *Mitchell* v. *Smale,* 140 U. S.
406; *Northern Ry. Co.* v. *Jordan,* 87 Cal. 23; *More* v. *Mas-
sini,* 37 Cal. 432; *San Francisco* v. *Le Roy,* 138 U. S.
670, 672; *Knight* v. *United Land Assn.,* 142 U. S. 185;
Civ. Code, sec. 830; *Jones* v. *Martin,* 13 Saw. 317, 318.)
The state cannot grant true tide lands; but holds the
same upon public trusts. (*Illinois Cent. R. R. Co.* v. *Illi-
nois,* 146 U. S. 387.)    The tide lands here patented were
expressly excluded from sale; and a patent for land
issued by the officers of the state has no effect, unless
expressly authorized by law. (*Summers* v. *Dickinson,* 9
Cal. 554; *Kile* v. *Tubbs,* 23 Cal. 442; *People* v. *Center,* 66
Cal. 551.)    The curative act should not be construed to
include lands not subject to sale. (*Rooker* v. *Johnston,* 49
Cal. 3, 5.)    The mere application of plaintiffs to purchase
before the passage of the act of 1870 gave plaintiffs no
vested rights, and the disposing power of the state officials
was taken away by that act. (*Urton* v. *Wilson,* 65 Cal.
11; *Rutledge* v. *Murphy,* 51 Cal. 394; *Eckart* v. *Campbell,*
39 Cal. 258–60; *Hutton* v. *Frisbie,* 37 Cal. 491; *Yosemite
Valley case,* 15 Wall. 86.)    San Diego was certainly a
"town," within the meaning of the amendatory act of
1870 (Stats. 1869–70, pp. 877, 878), even if it also was
to be regarded a city; of course, as the evidence shows,
it then partook more of the character of a village than
of a city; it could be called a city only conventionally.
The word "town" in the statute last mentioned includes
cities. (*State* v. *Parsons,* 40 N. J. L. 1; *Odegaard* v.
*Albert Lea,* 33 Minn. 351.)    The state, under which
plaintiffs claim, recognizes San Diego both as a town
and a city; and, in effect, declared it so to be. (*Mc-
Cauley* v. *Brooks,* 16 Cal. 11, 26, 27; *Mahony* v. *Bank of*

*State*, 4 Ark. 620; 1 Dillon on Municipal Corporations, sec. 42.) There being no power to make the patent, it was void, and could be collaterally assailed by the defendants. (*Cucamonga Fruit Land Co.* v. *Moir*, 83 Cal. 101; *Knight* v. *United Land Assn.*, 142 U. S. 176; *Edwards* v. *Rolley*, 96 Cal. 408; 31 Am. St. Rep. 234.)

*Works & Works*, and *Gibson & Titus*, for San Diego Land and Town Company and Coronado Ferry Co. *et al.*, Respondents.

The beach lands of a harbor were never authorized to be sold by the state of California. (*Kimball* v. *MacPherson*, 46 Cal. 103; *People* v. *Cowell*, 60 Cal. 400; *Upham* v. *Hosking*, 62 Cal. 250.) The lands attempted to be conveyed to plaintiffs' predecessors were never authorized to be conveyed by the state. (*United Land Assn.* v. *Knight*, 85 Cal. 448; 142 U. S. 160; *Carr* v. *Quigley*, 57 Cal. 394; *McLaughlin* v. *Heid*, 63 Cal. 208; *Chicago etc. Co.* v. *Oliver*, 75 Cal. 194; 7 Am. St. Rep. 143.) The legislature had no right to dispose of the lands, even if it had tried to do so. (*Illinois Central Ry. Co.* v. *Illinois*, 146 U. S. 387.) The title of plaintiffs has been held bad by this court. (*San Diego* v. *Allison*, 46 Cal. 162.)

*W. H. H. Hart, Attorney General*, and *David L. Withington*, for State Board of Harbor Commissioners, Respondents.

The state had no power to grant the lands in question; but they are held upon public trust. (*Illinois Cent. Ry. Co.* v. *Illinois*, 146 U. S. 387; *Ward* v. *Mulford*, 32 Cal. 366; *Wright* v. *Seymour*, 69 Cal. 126.) There was no legislative authority for the patent, and it passed no title. (*People* v. *Morrill*, 26 Cal. 336; *Taylor* v. *Underhill*, 40 Cal. 471; *Kimball* v. *MacPherson*, 46 Cal. 103; *Upham* v. *Hosking*, 62 Cal. 250; *Cucamonga etc. Co.* v. *Moir*, 83 Cal. 101.) The curative act does not apply, the lands being within the city limits of San Diego. (Pol. Code, sec. 3488; *San Diego* v. *Granniss*, 77 Cal. 511.)

The land was not the subject of sale, being within two miles of a town or village. (Act of 1870, Stats. 1869–70, p. 875.) The curative act did not operate upon such lands, nor have the effect to offer them for sale. (*Rooker* v. *Johnston,* 49 Cal. 3; *Copp* v. *Harrington,* 47 Cal. 241; *Rowell* v. *Perkins,* 56 Cal. 227.) The patent was not merely voidable, but absolutely void, for want of authority, and may be collaterally attacked. (*Doolan* v. *Carr,* 125 U. S. 618; *Knight* v. *United Land Assn.,* 142 U. S. 161; *Kile* v. *Tubbs,* 59 Cal. 191; *Leviston* v. *Ryan,* 75 Cal. 293; *Cucamonga etc. Co.* v. *Moir,* 83 Cal. 101; *Edwards* v. *Rolley,* 96 Cal. 408; 31 Am. St. Rep. 234; *Wright* v. *Roseberry,* 121 U. S. 519.)

McFARLAND, J.—This action was brought by Abraham Klauber and eighteen other plaintiffs against T. J. Higgins and a very large number of other defendants, including the city of San Diego, and the board of harbor commissioners for the bay of San Diego. In the complaint it is averred that the plaintiffs now are, and for a long time hitherto have been, " the owners seised in fee and lawfully entitled to the possession" of certain lands specifically described as lands embraced by eight different state tide land surveys adjoining each other. The lands thus described lie between low and high tide in the bay of San Diego, adjoining lands embraced in the territory over which extends the municipal government of the city of San Diego. It is averred " that the defendants above named, while the plaintiffs were so seised and possessed of said lands and premises, and entitled to possession thereof, did, to wit, on the ——, day of ——, 1890, without right or title, enter into and upon the same, and unlawfully took possession thereof, and still unlawfully withhold possession of the same from these plaintiffs, and said defendants claim an estate or interest in the above-described property adverse to the title of said plaintiffs." It is further averred, as to each and all of the defendants, that their claim is without any right, and that they have no title or inter-

est in said lands, or any part thereof, or any right to
the possession of the same.    The prayer is that it be
decreed "that the defendants have not, nor has either
of them, any estate or interest whatever in or to said
lands or premises, and that the title of the said plain-
tiffs thereto is good and valid, and that plaintiffs have
a writ for the possession of the premises aforesaid
against the defendants herein," and that defendants be
debarred, etc., from setting up any claim to said prem-
ises.    The defendants, with the exception of a few who
disclaimed, answered, denying that plaintiffs, or either
of them, had any right, title, or interest in or to said
premises, and setting up title or right of possession in
themselves.    The court found that none of the plain-
tiffs were seised of said lands, or entitled to possession
thereof, and that the defendants did not at any time
enter upon the same without right or title, or unlaw-
fully take possession thereof, or that they unlawfully
withhold the same from plaintiffs; and judgment was
entered accordingly for defendants.    From this judg-
ment, and from an order denying a motion for a new
trial, plaintiffs appeal.

The premises in controversy are tide lands over which
the waters of the bay of San Diego ebb and flow, and
the appellants claim title thereto upon applications for
their purchase under a general law of the state, approved
March 28, 1868 (Stats. 1867–68, p. 507), entitled "An
act to provide for the management and sale of the lands
belonging to the state," which act, commencing at sec-
tion 22 thereof, provides for the sale of "the swamp and
overflowed salt marsh and tide lands belonging to the
state," and upon patents afterward issued upon said ap-
plications.

A large part of the arguments of counsel on both
sides is directed to the question whether or not the leg-
islature of the state had any power at all to provide for
the sale of and to convey title to lands of the character
involved in this action; but, under the views which we
take of the case, it is not necessary to consider that

question, because, in our opinion, the particular lands
here involved were reserved from the operation of said
act of March 28, 1868. If the only question involved
here was as to the *character* of the lands in question, it
would no doubt be true under former decisions, that the
officers of the land department of the state, by receiving
the applications and issuing patents thereon, had deter-
mined that the character of the lands was such as de-
scribed in the act, and that their determination of that
question could not be collaterally impeached. (See *Gale*
v. *Best*, 78 Cal. 235; 12 Am. St. Rep. 44, and the cases
there cited.) That is to say: "If a large body of public
lands be subjected to sale or other disposition under a
law which has merely a general reservation of such
parts of those lands as may be found to be of a particu-
lar character—such as swamp or mineral—then the land
department has jurisdiction to determine the character
of any part thereof, and a patent is conclusive evidence
that such jurisdiction has been exercised." But if there
be no law for the sale of certain lands, no matter what
their character be, then a sale of such lands by the offi-
cers of the land department of the government is with-
out authority and void. As we said in *Gale* v. *Best, supra:*
"Of course, if the patent be void upon its face, or if,
looking beyond the patent for a law upon which it is
based, it is found that there is no law which authorizes
such a patent under any state of facts, or that the par-
ticular tract named in the patent has been absolutely
reserved from disposal, then the patent will be worthless
and *assailable from any quarter*. For instance, if a cer-
tain section or a certain township described by legal
subdivisions should be expressly and unconditionally re-
served by Congress from disposal under any other stat-
ute, a patent for any part of such tract would be void."
(See *Steel* v. *St. Louis etc. Co.*, 106 U. S. 452, 453.)
This principle, applied in numerous decisions of the
supreme court of the United States to the public lands
of the general government is equally applicable to lands
of the state. If, therefore, the land in contest in the

case at bar was reserved from sale by the said act of the
legislature under which appellants claim, the officers of
the government had no right to sell the same, and any
attempt on their part to do so was void. And we think
that said land was clearly so reserved. The applica-
tions under which appellants claim were not approved
until November, 1871, and no payments were made by
the applicants prior to that time. They therefore had
made no contract with the state, and had no vested
rights until that time. But before that time, to wit, on
April 4, 1870, the legislature amended section 70 of said
act so as to read as follows:

"All the swamp and overflowed, salt marsh and tide
lands within one mile of the state prison at San Quen-
tin, within five miles of the city and county of San Fran-
cisco, within five miles of the corporate limits of the city
of Oakland, and within *two miles* of any town or village,
are hereby excluded from the provisions of this act."
Appellants contend that this provision does not apply in
the present instance, because San Diego is a city, and
therefore not a town or village; but this position is not
tenable. In the first place, it is doubtful whether at the
time the applications were approved San Diego was in
any sense a city. It seems to have been incorporated
as the city of San Diego by an act passed March 27,
1850, entitled "An act to incorporate the city of San
Diego" (Stats. 1850, p. 121); but that act was repealed
by an act approved January 30, 1852, entitled an act
"to repeal the charter of the city of San Diego, and
create a board of trustees." And by that act a board of
trustees was created and given certain rights and pow-
ers, among which was the power to pay off the debts of
the city whose charter was repealed; there is nothing
said in the repealing act about any "city"; and after-
ward, by an act approved April 16, 1852, entitled an act
"for the relief of the indigent sick," it is provided that
"the trustees of the *town* of San Diego" are given cer-
tain powers, which act must have gone upon the theory
that there was no longer any city of San Diego, but that

the same was a town. In other acts of the legislature it was called a city, so that it was recognized by the state both as a "town" and a "city." But upon general principles the word "town," as used in said section 70 of the amendatory act of 1868, clearly includes a city. The word *"town"* is used to designate either a place where there are a number of adjacent occupied dwellings, or as a municipal corporation organized under various statutes of different states, but in either sense it includes a city unless used in some connection which shows that a different meaning was intended. And it would be absurd to say that the legislature intended to withhold the sale of tide lands in front of a place where a considerable number of persons had settled in such a way as to constitute what we mean in common parlance by a village or town, only in the event that the place was not called a city, or had not been organized under a statute providing for the organization of a municipal corporation to be called a city. Certainly the clear purpose of the legislature would include such a place, however named, or however municipally incorporated. This view is amply supported by authority. Blackstone says: "The word 'town,' or 'vill,' is indeed by the alteration of times and language now become a generical term comprehending under it the various species of cities, boroughs, and common towns. A city is a town incorporated." (1 Blackstone's Commentaries, 114.) Burrill defines *"town"* as follows: "A collection of houses in one neighborhood; a generical term comprehending under it the several species of cities, boroughs, and towns." In *Board of Commrs.* v. *McGurrin,* 6 Daly, 349, the question was whether a certain act touching the suppression of intemperance, etc., which referred in terms only to overseers of a "town," applied to the city of New York, and it was held that it did. The court said: "It does not follow that because this amendment designates overseers of the town where the penalty was incurred, that cities were not intended to be included. 'Every borough or city,' says Tomlins, 'is a town.' The greater

necessarily includes the less, for a city begins as a village, extends into a town, and afterward becomes a city by incorporation or otherwise; for there are cities that were never incorporated." The court, after referring to Blackstone, says further: "In common parlance the word is frequently applied to cities, as 'leaving town,' 'come into town,' 'out of town,' etc. We have in this state the political division of towns, cities, and incorporated villages, and that that particular political division is what is meant by the word 'town' may in a given case be apparent from the purpose of the statute. But that is not the case here. This was an amendment of a section of a statute applying to the whole state." In New Jersey the constitution of the state was amended so as to provide that the legislature should not pass private, local, or special laws "regulating the internal affairs of towns and counties"; and in *State* v. *Parsons*, 40 N. J. L. 1, it was contended that cities were not embraced in the expression "towns and counties" in said amendment. But the court held otherwise, and, among other things, said: "The contention is that the word 'towns' does not embrace 'cities.' But this argument is founded on the false basis of looking only at the letter of the law and turning away from the spirit. It is true that if the letter of the law were absolutely unambiguous and definite, and were susceptible of but a single meaning, the clause would have to be read in such sense, no matter to what futility it might lead. But this is not the case; the word 'town' has no such fixed signification as this, for, though in its narrower sense it denotes something other than a city, in its broader scope it comprehends such a municipality. Mr. Tomlins in his law dictionary, under the title 'Town,' says: 'Under the name of the town or village, boroughs, and it is said cities, are contained, for every borough or city is a town.' Lord Coke in 1 Institutes, 116, showing the capaciousness of the term, has this language: 'And it appeareth by Littleton that a town is the genus and a borough is the species.' Bouvier's definition of the

word 'city' is 'a town incorporated by that name.' "
Afterward, having reference to certain other matters,
the court further said: "But this uncertainty obtains
only so long as we yield our minds to the rigor of verbal
definitions; for when once we emancipate ourselves from
such bondage, and look at the purpose of the law, all
doubts are at an end. When we find that the adoption
of the narrow signification of the term used will lead to
positive absurdity, and that the reception of the word
in its wider import is attended with the establishment
of a rule of public policy both wise and salutary, it is
not difficult to make choice between the alternatives."
In *Odegaard* v. *Albert Lea*, 33 Minn. 351, the question was
whether said city was required by law to care for its
poor under an act which referred in terms to "towns"
only, and did not mention cities *eo nomine;* and the
court held that the act did apply to cities. The court
in its opinion, among other things, said: "The city or
village bears substantially the same relation to the state
government and has substantially the same functions
of local government as the town. Indeed, a city is but
an incorporated town, with such special powers and
special mode of government as the circumstances re-
quire. . . . . The word 'town' is often used as generic
term embracing all such primary municipal corpora-
tions as incorporated cities and villages, and, independ-
ently of any statutory provision, it has become a
well-settled rule of construction that the term 'town'
when used in a general statute, may include cities, un-
less the contrary appears from the whole statute to have
been the intention of the legislature. (1 Blackstone's
Commentaries, 114; *Road in Milton*, 40 Pa. St. 300;
*Board of Commrs.* v. *McGurrin*, 6 Daly, 349; *Peck* v.
*Weddell*, 17 Ohio St. 271; *State* v. *Glennon*, 3 R. I. 276;
*Flinn* v. *State*, 24 Ind. 286; Abbott's Law Dictionary,
'Town.')" The foregoing authorities are clearly to the
point that in the statute now here under review the
word "town" embraces city. And under this view
the *territory* within which the land described in the

complaint is situated was reserved from sale, and the officers of the land department of the state had no authority to sell it, no matter what they may have deemed the character of the land—as whether tide lands or not —was. Therefore, there being no law for the sale of said land, its attempted sale and the patents intended to perfect said sale are void.

Appellants contend that, although their title to the lands in question may have been invalid under said act of 1868, yet that their title was confirmed and perfected by the act of the legislature, approved May 27, 1872. (Stats. 1871–72, p. 622.) That act is entitled " An act to *legalize applications* heretofore made for the purchase of lands belonging to this state, and to confirm the title of the purchasers under such applications." The first section reads as follows: " All *applications* heretofore made for the purchase of lands belonging to this state under the provisions of any act authorizing the sale of state lands shall be good and valid, although the land described in such application and affidavit may be styled salt marsh and tide lands, when in fact it is swamp and overflowed land; or may be styled swamp and overflowed land, when in fact it is salt marsh and tide lands; or may be styled swamp and overflowed and salt marsh and tide land when in fact it may be either." Section 2 provides that " in all cases where patents have been or may hereafter be issued upon any such *applications or affidavits as described in section 1 of this act* for any such land, the same shall be deemed and held to convey the legal title to the land in such patent or patents described to the purchaser therein mentioned by *whatever style* such land may be designated in such patent." The purpose of this act was clearly simply to legalize applications for lands which were subject to sale under some law of the state, where such applications were defective in manner as described in the act, namely, where the land had been designated in the application as swamp and overflowed land, when in fact it ought to have been described as salt marsh and tide

land, or *vice versa*. The language of this court in *Rooker* v. *Johnston*, 49 Cal. 3, in which the act of March 24, 1870 (Stats. 1869–70, p. 352), entitled "An act to legalize certain applications for the purchase of lands belonging to this state," was construed, is applicable to the construction of the act now under review. The court, there said: "The act, as we construe it, deals with the applications alone, and does not intend or have the effect to offer for sale lands which were not subject to sale under the general law. It is not the purpose of the act to declare that an application for the purchase of land which had not been offered for sale when the application was filed should be good and valid, and that the applicant might proceed with and complete his purchase; but the intent was to make the application as valid as it would have been had it been free from all defects, had it contained within itself all that the statute required it to contain." And so in the case at bar, the said confirmatory act of 1872, was merely intended to validate applications for lands subject to sale which were defective, and not intended to apply to lands that were reserved from sale under the general law. This view renders it unnecessary to consider the contention of respondents that on the same day on which said confirmatory act was passed another act was passed, entitled "An act for the relief of purchasers of state land" (Stats. 1871–72, p. 578), in which it was provided that the act should not apply to any lands within the county of San Diego, and that the two must be construed together, and thus construed exempts the county of San Diego from the operation of either.

There is nothing in the position of appellants that respondents are not in a position to attack the patents under which appellants claim. It is averred in the complaint that the respondents were in possession of the land described in the complaint at the commencement of the action; and, one in possession of land is always in a position to contest the right of another claiming under a void patent. (*Cucamunga Fruit Co.* v.

*Moir*, 83 Cal. 101; *United Land Assn.* v. *Knight*, 85 Cal. 448; *Edwards* v. *Rolley*, 96 Cal. 408; 31 Am. St. Rep. 234.) In *Steele* v. *St. Louis etc. Co.*, *supra*, the United States supreme court, after having said that in certain cases a patent was conclusive, uses this language: " It need hardly be said that we are here speaking of a patent issued in a case where the land department had jurisdiction to act, the lands forming part of the public domain, and *the law having provided for their sale*. If they never were the property of the United States, or if no legislation authorized their sale, or if they had previously been disposed of or reserved from sale, the patent would be inoperative to pass the title, and objection to it could be taken on these grounds *at any time and in any form of action*." Moreover, some of the respondents, as, for instance, the board of harbor commissioners for the bay of San Diego, do connect themselves directly with the right of the state to said lands.

The judgment and order appealed from are affirmed.

Van Fleet, J., Garoutte, J., Temple, J., Harrison, J., Henshaw, J., and Beatty, C. J., concurred.