[Civ. No. 10848. Fourth Dist., Div. One. Aug. 17, 1972.]

JOHN JOSEPH DILLON et al.,
Plaintiffs, Cross-defendants and Appellants, v.
SAN DIEGO UNIFIED PORT DISTRICT et al.,
Defendants, Cross-complainants and Respondents.

## COUNSEL

Ogle & Gallo, Allan P. Murphy, Charles E. Ogle, Gant & Asaro and Richard A. Gant for Plaintiffs and Appellants.

Evelle J. Younger, Attorney General, Jay L. Shavelson, Assistant Attorney General, Peter H. F. Graber, Deputy Attorney General, Joseph D. Patello, Burch, Platt & Peterson, Charles E. Burch, Jr., Luce, Forward, Hamilton & Scripps and Robert G. Steiner, for Defendants and Respondents.

## OPINION

**WHELAN, J.**—This appeal is from a judgment entered in several actions consolidated for trial. John Joseph Dillon, Antonino Minutoli, Mary E.

Cassidy and Eugene F. Snow were the original plaintiffs in action No. 283455. By stipulation filed March 3, 1969, the parties plaintiff were declared to be Dillon, Minutoli, Snow, Richard F. Cassidy as administrator of Mary E. Cassidy, Richard Epstein, Olga Epstein, Elsa E. Haber and Elizabeth Cosby. All of those plaintiffs have appealed from the judgment denying them relief in their action to quiet title to certain tidelands in the County of San Diego.

Defendants representing at least nine separate interests were named in the complaint, all of whom filed cross-complaints against the plaintiffs. The owners of six of those separate interests filed six separate actions, based upon 20 years of occupancy, against all persons known or unknown (No. 309684–309689).

Judgment was entered June 23, 1969. After the filing of the record on appeal in this court, plaintiffs dismissed the appeal as to all defendants other than the San Diego Unified Port District (District) and the State of California (State). Among the parties as to which the appeal was dismissed was the City of Chula Vista (Chula Vista).

As a result of that dismissal the subject of the appeal is that part of Tidelands Survey No. 17 (TLS 17) now lying westerly or waterward of the ordinary high water mark.

Plaintiffs are successors in interest of Joseph Nash, to whom on March 6, 1888, a patent from State issued for the lands shown on TLS 17 after he had paid, on April 4, 1871,[1] the sum of one dollar per acre to State.

The sale was made under the authority of the Act of March 28, 1868, which by an amendment adopted April 4, 1870, excluded from its operation any lands within two miles of any town or village.

The judgment which quieted the titles of the various cross-complainants as against the claims of plaintiffs is supported by extensive and complete findings. Among them are findings that support the application of the 20-year as well as the 5-year statute of limitations, and findings that TLS 17 on April 4, 1871 was wholly within a radius of two miles of National City and that National City on that date was a town or village.

The trial court held that the property in question constitutes sovereign tide and submerged lands of State held in trust for the public uses and purposes of commerce, navigation and fisheries by District.

Plaintiffs contend National City on the significant date was not a town

---

[1]It is conceded the rights if any of Nash, the predecessor in interest of plaintiffs, vested on April 4, 1871.

or village; and if it had been, the tidelands in question were not within two miles of the town or village.

As to the statutes of limitations, plaintiffs contend that as concerns State and its agencies no action could have been commenced prior to 1963, when it is said Public Resources Code section 6463 was enacted to permit suit against State.

The conclusion there was laches on the part of plaintiffs which barred their action is also the subject of attack.

By the time oral argument was heard in this case several positions that plaintiffs had taken in the trial court and in their opening brief on appeal were no longer urged with conviction. Thus, as a result of the decision in *Marks v. Whitney*, 6 Cal.3d 251 [98 Cal.Rptr. 790, 491 P.2d 374], plaintiffs tacitly concede the tidelands in question were subject to a public trust for commerce, navigation and fisheries.[2]

The trial court held in favor of the pleaded defense of laches based upon findings of extensive improvements and outlays of public moneys since State in 1925, under legislative authority, conveyed to Chula Vista certain tidelands along the east side of San Diego Bay including the property in question, subject to public trusts for purposes of commerce, navigation and fisheries.

Concerning the affirmative defenses of limitations and laches, the attack in plaintiff's opening brief was not upon the sufficiency of the evidence, but derived from the theory there was nothing plaintiffs could have done legally to enforce their rights prior to the enactment of Public Resources Code section 6463 in 1963.

We discuss later a different claim made in a reply brief by a hand different from that of the author of the opening brief.

Plaintiffs' action was filed March 16, 1964.

### THERE WAS SUBSTANTIAL EVIDENCE TO SUPPORT THE FINDING NATIONAL CITY WAS A VILLAGE ON APRIL 4, 1871

 No reported decision has defined village as the word was used in the 1870 act excluding tidelands within two miles of a village from operation of the Act of March 28, 1868.

In *Klauber v. Higgins*, 117 Cal. 451 [49 P. 466], the court held that

---

[2]At oral argument also a claim the appeal had not been dismissed as to Chula Vista was completely abandoned.

since the tideland in question was determined to be within two miles of San Diego, it must also be within two miles of a town because of the obvious purpose of the act, regardless of whether San Diego was an incorporated city, which apparently it was not at the time.

There are some observations about villages in *People* v. *Van Nuys Lighting District*, 173 Cal. 792 [162 P. 97], and a square holding that an area 13 miles in length and 6 miles in width, containing about 50,000 acres, including 4,500 acres of farmland upon which only 25 persons resided, was not a village within the meaning of an act to allow unincorporated towns and villages to maintain systems of street lighting by the formation of highway lighting districts.

In *People* v. *Van Nuys Lighting District, supra,* 173 Cal. 792, 794, 795-796, 797, the court noted: "Within this territory are two unincorporated villages, one known as Van Nuys, occupying about 640 acres and having about 350 inhabitants; the other known as Owensmouth, covering 320 acres and having about one hundred inhabitants. . . .

". . . . . . . . . . . . . . . . . . .

". . . The words 'town' and 'village' are of common use and have a well-defined meaning. The word 'town' is defined by Webster as 'In general, any large collection of houses and buildings, public and private, constituting a distinct place with a name and not incorporated as a city.' He defines a village as 'Any small aggregation of houses in the country, being in general, less in number than in a town or city and more than in a hamlet.' The word 'town' is also defined as meaning, in popular use, 'a large closely populated place, as distinguished from the country, or from rural communities.' [Citation.] Also as 'An aggregation of inhabitants and a collection of occupied dwellings and other buildings.' [Citation.] Also as 'A place where there are a number of adjacent occupied dwellings.' [Citation.] There is no substantial difference between an unincorporated town and a village except that perhaps the latter is usually understood to be smaller than a town. With respect to the boundaries of such places, it is true that they are usually not well defined. The line where the village or town ceases and the country begins cannot usually be located with precision, although it is seldom difficult to locate it approximately."

An Iowa court declared, "A 'village' is defined to be a town site platted and unincorporated." (*Way* v. *Fox,* 109 Iowa 340 [80 N.W. 405, 407].)

The Iowa court in the same decision, at page 406, used this language: "Between the original limits of the town of Garner and the plat of the village of Concord is a large amount of land, used wholly for agricultural

purposes, which has not been platted, and which the petitions allege was in no way needed for municipal purposes, nor for the prospective future growth and development of the town of Garner."

In 1943 the California Legislature enacted Government Code sections 20 and 21, which read as follows: Section 20: " 'City' includes 'city and county' and 'incorporated town,' but does not include 'unincorporated town' or 'village.' "

Section 21: " 'Town' includes 'unincorporated town' and 'village.' "

An incorporated city may contain as few as 500 inhabitants. (Gov. Code, § 34302.)

The word "village" has come to us from the English law, to whose history we may look for such assistance as it may give. The historical background of the formations of municipal government in California is also relevant to our inquiry.

In the post-Norman Conquest England, the village included areas of vacant land cultivated by the villagers, or villeins. A villager might have as many as 30 acres of such land. The village as a physical area, the villa, was distinguished from its inhabitants as a community, the villata, or township.[3]

In the California of Spain and Mexico, a pueblo was the unit of municipal government. If a pueblo was founded and recognized as such it had assigned to it four square leagues of the public domain. Since the Spanish league was about 2.6 miles, the limits of a pueblo took in about 6,656 acres.

San Jose was the first pueblo founded in California when 66 men, women and children came south from the San Francisco presidio under orders from the governor, settled there and founded the pueblo on November 29, 1777.[4]

As recited in *People* v. *Van Nuys Lighting District, supra,* 173 Cal. 792, 794, the village of Van Nuys had nearly 2 acres for each of its 350 inhabitants; the village of Owensmouth, more than 3 acres for each of its 100 inhabitants.[5]

---

[3]For an illuminating exposition of the subject, see 1 Pollock & Maitland, History of English Law, pp. 562, 564, 567; see also Maitland, The Constitutional History of England, p. 47.

[4]Land in California, W. W. Robinson, University of California Press (1948) pages 34-37.

[5]In *Kirby* v. *Alcoholic Bev. etc. Appeals Bd.,* 7 Cal.3d 433, 437 [102 Cal.Rptr. 857, 498 P.2d 1105], there is mention of the village of Isla Vista, with approximately 10,300 inhabitants.

█ It is the claim of plaintiffs that the issuance of the patent to Nash constituted an official determination TLS 17 was not within two miles of a town or village. A similar contention was made in *Klauber* v. *Higgins, supra,* 117 Cal. 451, 463, where the court said: "[T]he officers of the land department of the state had no authority to sell it, no matter what they may have deemed the character of the land—as whether tide lands or not—was. Therefore, there being no law for the sale of said land, its attempted sale and the patents intended to perfect said sale are void."

In *People* v. *California Fish Co.,* 166 Cal. 576, 590-591 [138 P. 79], the court said: "The surveyor general's approval of the application and survey was necessary. But this requirement applied only to the form of the survey and application and the qualifications of the applicant. It did not empower him to reject the application on the ground that the land was not suitable for cultivation, or that it was needed for navigation, or that its sale to private use would interfere with or destroy the public easement to which such land is dedicated. The applicant determined what land he desired to buy, he caused it to be surveyed if that had not already been done, he made his application and, if he was a person qualified to buy and his proceedings were regular in form, he thereupon became entitled to complete the purchase and could compel the officers of the state to execute the title papers necessary to convey it to him, on payment of the fixed price of one dollar an acre."

We hold the issuance of the patent was not a conclusive administrative determination National City was not a town or village or TLS 17 was not within two miles of a town or village.

█ In their reply brief, for the first time plaintiffs mention allegedly erroneous rulings of the trial court in excluding evidence that certain tide-land patents had been issued to the two men who owned the property which was subdivided under the name of National City. The patents if issued had not been recorded in San Diego County. It is argued that in applying for the patents the Kimball brothers must have made affidavits that the tidelands allegedly along the waterfront of National City were not within two miles of a town or village. No such affidavits were produced or shown to have existed, or if executed whether before or after the statutory amendment excluding tidelands within two miles of a town or village.

Apart from the question whether the act of the Kimball brothers could disprove the existence of a community of which, if it existed, they could have been only two of the members, no error has been shown in the exclusion of the offered evidence.

The trial court's finding National City was a town or village on the relevant date is supported by substantial evidence.

The evidence on the subject was from two expert witnesses, one on each side.

District and State presented the evidence of an anthropologist who had for five years made a study of all official records dealing with the early history of National City, of contemporary diaries and correspondence, newspapers and other publications, maps and historical studies.

The concept of National City had its origin in the filing in 1869 of a map of a platted townsite, divided into blocks and lots, with streets.

The anthropological witness described the nature and location of various improvements in existence in National City as of April 4, 1871, in addition to the residents' homes. Such improvements included a partially completed but operable wharf at the prolongation of 17th Street, a post office, a school, a stage depot, two hotels, two warehouses, two stores, a lumberyard, a boat-building works, two blacksmith shops, a law and real estate office, and even a saloon. Nearby there were a cemetery that had been established in 1870 and picnic grounds. Although there were no church buildings as of April 4, 1871, religious services were being held in private homes and in the school.[6]

In the opinion of the witness National City was a town on the relevant date, the southerly boundary of which was at least as far south as 32nd Street.

The witness for the plaintiffs was a professor of sociology.

Apart from the testimony of the expert witness of District and State, the expert witness produced by plaintiffs gave expression to the following opinions concerning National City on the relevant date: "it could be a small village"; the National City Township had 387 inhabitants, 50 or so families; there is at least the coming into existence of a city; "there is some kind of entity that people see as National City."

█ The more difficult question is whether the area covered by TLS 17 was wholly within two miles of the village.

The town as platted extended from Division Street on the north to 32nd Street on the south, a distance of some two miles. The center of the village

---

[6]For an account of the public interest in San Diego in March 1871 in the prospect the Texas and Pacific Railroad would make San Diego its western terminus, and the rival hopes of the people of National City that National City would be that terminus, see 4 Pourade, History of San Diego (The Glory Years) (1964), pages 83-84.

was placed by District's expert witness at 16th and National. Its westerly boundary was the high tide mark of the waters of San Diego Bay.

The total area of the platted townsite of National City was about 960 acres.

Before 1870 there were improvements upon property between 23rd and 24th Streets, between 25th and 26th Streets, and between 27th and 28th Streets.

The development does not appear to have been a spilling over from San Diego at the north. Prior to 1872 there were no improvements within the platted townsite north of Fifth Street.

The development also extended east of the platted townsite. Before 1871 there were improvements immediately east of the platted townsite between 29th and 31st Streets if they had been extended easterly, and fronting on National Avenue whose east line was the easterly boundary of the platted townsite.

It is likely that a self-conscious group of settlers in National City in 1869 and 1870 did not think of their community as ending at the last house to the south.

The village, considered as a community of persons in the atmosphere of the late 1860's, would no doubt have conceived itself as a growing community and needing space for its growth and expansion. The mood of the day in the west was expansionist.[7]

It is not unreasonable that the village should be conceived as extending 1,320 feet southerly of the most southerly dwelling within the platted townsite, or 330 feet southerly of the most southerly of the improved parcels in the area fronting National Avenue to the east, and considered a part of the same community.

If the town or village extended to 32nd Street on the south and to the mean high tide line of the bay on the west, all of TLS 17 was within a radius of two miles.

The trial court's finding in that regard was reasonable in view of the evidence accepted by the court, which was itself not unreasonable.

---

[7]Even before Horace Greeley, a writer in 1851 had said, "Go West, young man, go West." Greeley adopted it in 1854, and later said, "Go West, young man, and grow up with the country." A writer in 1845 had written of: "Our manifest destiny to overspread the continent allotted by Providence for the free development of our yearly multiplying millions." (John L. O'Sullivan, U. S. Magazine and Democratic Review (1845).)

What was said of the discretion of the board of supervisors in *People* v. *Van Nuys Lighting District, supra,* 173 Cal. 792, 797, may be appropriately applied to the finding of the trial court in the case at bench: ". . . Doubtless the board of supervisors would have much discretion upon the question whether or not any particular parcel of land could reasonably be included as part of such town or village. The courts should be loath to set aside the proceeding for error in this particular, and would not do so unless the unwarranted inclusion is clear."

## THE PROPERTY IS SUBJECT TO A PUBLIC TRUST

■ Plaintiffs have cited certain decisions dealing with sales by State of lands below the high tide line bordering San Francisco Bay under an act of March 30, 1868, which provided for a determination that some such lands were divested of the public trust and were suitable for reclamation for such purposes as agricultural or residential. (See *Knudson* v. *Kearney,* 171 Cal. 250 [152 P. 541]; *Alameda Conservation Assn.* v. *City of Alameda,* 264 Cal.App.2d 284 [70 Cal.Rptr. 264].)

A finding there has been a divesting of the public trust may be based only upon a clear legislative intention that there be such divesting. (See *Forestier* v. *Johnson,* 164 Cal. 24, 32 [127 P. 156].)

The Act of March 28, 1868 does not disclose any such intent. (See *Marks* v. *Whitney, supra,* 6 Cal.3d 251.)

The trial court's determination the public trust attaches to the property in question must be upheld. (*Marks* v. *Whitney, supra,* 6 Cal.3d 251.)

It is true that portions of TLS 17 originally below the mean high tide line of San Diego Bay are no longer so, in part as the result of dredging and the deposit landward of the spoil. The portions so developed have not passed into private ownership or use by devolution from Joseph Nash, but by contract with Chula Vista authorized by State. (See *City of Long Beach* v. *Mansell,* 3 Cal.3d 462 [91 Cal.Rptr. 23, 476 P.2d 423].)

## THE STATUTE OF LIMITATIONS WAS PROPERLY APPLIED

■ The contention the statute of limitations did not operate in favor of District or State is based upon two elements: one, the established rule that the statute of limitations is deemed to run against a person only when he may, in the exercise of due diligence, institute an action on his own volition (*Wells* v. *California Tomato Juice, Inc.,* 47 Cal.App.2d 634 [118 P.2d 916]); during any period in which he is legally prevented from taking action to protect his rights, the statute is suspended (*County of Santa Clara* v. *Hayes Co.,* 43 Cal.2d 615 [275 P.2d 456]).

The second element is the theory plaintiffs could not have maintained their action until 1963 when Public Resources Code section 6463 was enacted.

Section 6463 provides in part: "Any person or persons claiming title under a patent of tideland, issued by the State of California, may bring suit against the State, or against the State with others, in accordance with law in any court of competent jurisdiction of the State, to quiet title or otherwise determine the validity of such patent or establish boundaries of the land granted thereby or both, and may prosecute the action to final judgment."

Article XX, section 6 of the California Constitution provides: "Suits may be brought against the State in such manner and in such courts as shall be directed by law."

Public Resources Code section 6308 was enacted in 1951.[8] It now provides in part: "Whenever an action or proceeding is commenced by or against a county, city, or other political subdivision or agency of the State involving the title to or the boundaries of tidelands or submerged lands that have been or may hereafter be granted to it in trust by the Legislature, the State of California shall be joined as a necessary party defendant in such action or proceeding."

Section 6308 contains a clear direction that State be joined as a party in an action against such an agency of State as District or such a political subdivision as Chula Vista.

The first grant in trust by State to Chula Vista of tide and submerged lands, including all or a portion of TLS 17, was in 1925; other grants were made in 1947, 1953, 1959 and 1961. As found by the court, Chula Vista from 1925 and continuously thereafter openly exercised possession and control of TLS 17.

After the creation of District, Chula Vista, under legislative authorization, on March 12, 1963 conveyed to District, in trust for certain public uses, all of its interest in tide and submerged lands theretofore granted to Chula Vista in trust, including all of TLS 17 lying waterward or westerly of the ordinary high water mark.

There was nothing to have prevented plaintiffs from commencing and maintaining an action against Chula Vista from 1925 on; such an action, if commenced after the effective date of section 6308, would have required the joinder of State as a necessary party. Such a joinder was authorized,

---

[8]The section was amended in 1963 by adding the words "by or" in the first line.

directed and required from 1951 on. (*Abbot Kinney Co.* v. *City of Los Angeles,* 53 Cal.2d 52, 57 [346 P.2d 385].)

Actions against such a political subdivision of State to determine title to tidelands granted by patent had not been uncommon. Instances of such actions are found in *Patton* v. *City of Los Angeles,* 169 Cal. 521 [147 P. 141], and *Newcomb* v. *City of Newport Beach,* 7 Cal.2d 393 [60 P.2d 825].

As successor in interest of Chula Vista, District may urge the bar of limitations which arose during Chula Vista's possession under a claim of right of the property in question.

The findings and judgment in favor of Chula Vista and the issues as to Chula Vista framed by the pleadings are such that the judgment in its favor may be res judicata that the rights of its successor in interest, District, have superseded any rights that may have been possessed by plaintiffs and their predecessors in interest.

In its answer and in its cross-complaint, Chula Vista asserted present ownership of certain parcels no longer below the ordinary high water mark and less than the whole of that claimed by plaintiffs.

However, Chula Vista, in its answer to the complaint of plaintiffs, asserted the bar of limitations under Code of Civil Procedure section 318, a five-year statute. That defense applied to the whole of plaintiffs' claims and alleged cause of action.

Section 318 reads: "No action for the recovery of real property, or for the recovery of the possession thereof, can be maintained, unless it appear that the plaintiff, his ancestor, predecessor, or grantor, was seized or possessed of the property in question, within five years before the commencement of the action."

The trial court found neither plaintiffs nor their predecessors in interest had ever possessed, occupied or been seized of any part of TLS 17.

Chula Vista has also a reversionary interest in the tidelands since the legislation that established District provided that should District ever be dissolved the land conveyed to it by any city would revert to that city.[9]

As a result of the shift of positions from those taken at trial and in the opening brief, it is now argued for the first time that the uses made by Chula Vista were not inconsistent with the public trust uses, so that plaintiffs and their predecessors in interest could not have prevented such uses

[9]Statutes of 1962, First Extraordinary Session, chapter 67, section 69.

and Chula Vista could not claim adverse possession because such uses were not adverse to the title held subject to the public trusts.

The second departure from the position taken in the opening brief is included in the foregoing argument, since the prior contention as to the statute of limitations has been there was no statutory authority to join State as a party prior to 1963, a contention whose nontenability is perhaps now recognized if not conceded.

For the first time in their reply brief, plaintiffs attacked the sufficiency of the evidence to support the trial court's finding Chula Vista and State were in open, adverse, hostile, exclusive and continuous possession of all of TLS 17 westerly or waterward of the ordinary high water mark of San Diego Bay, as established by the State Lands Commission. The reply brief concedes that such land is the only subject of this appeal and the only land in which State or District has any interest.

Apart from the facts that the judgment in favor of Chula Vista is a final adjudication that plaintiffs have no rights in the property as against Chula Vista, and that District has succeeded to Chula Vista's rights, there was substantial evidence in support of the finding under attack.

The reply brief does not eliminate as a possible support for the trial court's finding of hostile possession all of the evidence on the subject. It does not succeed in eliminating as such possible support all of the evidence it does discuss. Thus, while the use by Chula Vista of the tidelands for a sewerline that deposited sewage in the bay is said to be use for commerce, navigation or fisheries, no authority is cited for the unusual proposition.

Industrial use as found and shown by the evidence is by the reply brief equated with commerce.

It is not every money-making activity that comes under the definition of commerce. There must also be present the element of business intercourse between persons by way of sale, exchange or traffic.[10]

---

[10]The subject was discussed in *State of California* v. *Tagami,* 195 Cal. 522, 528-529 [234 P. 102], where it was said: "The words 'trade' and 'commerce' are frequently found in conjunction or juxtaposition in treaties between nations and in those constitutions and laws which define and regulate the scope and purposes of such international engagements. They are also often employed by lexicographers in defining each other. When so employed, and particularly when so used in the conjunctive, they are held to impart to each other an enlarged signification which would include practically every business occupation carried on for the purpose of procuring subsistence or profit and into which, or any material part of which, the elements of bargain and sale, barter, exchange or traffic enter. Each of these terms has sometimes been subjected to two limitations which would distinguish them from unskilled labor

The leasing by Chula Vista of portions of TLS 17 for industrial use cannot be said as a matter of law to be for one of the public trust purposes. The enabling act for the creation of District distinguishes between commercial and industrial use, and expressly authorizes industrial and other uses not all of which seem to come within earlier concepts of commerce, navigation and fisheries.[11]

The products of manufacture are usually for use in commerce, but manufacture is not itself commerce. Nor would the filling in for industrial use of areas that once were between the high and low tide lines necessarily be for one of the public trust purposes.

It has not been shown that there is no substantial evidence to support a finding that the possession and use by Chula Vista of the area within TLS 17 was adverse to the claims of plaintiffs and their predecessors in interest.

## WAS THE DEFENSE OF LACHES PROPERLY APPLIED?

Attack is made upon the sufficiency of the evidence to support a finding of laches, if the defense were applicable in view of the claim of plaintiffs they were unable to sue before 1963.

In a sense they were, not because of a legal impediment, but through ignorance of the existence of TLS 17 and the patent under which they claim, and of which they first became aware in 1962, when plaintiff Snow

---

and even from agricultural employments on the one hand and from professional employments and the exercise of the fine arts on the other. (See Standard Dictionary, 'Trade.') Of these two phrases the terms 'commerce' and 'commercial' are usually given the larger signification as embracing those dealings in general which arise and are conducted in the course of business and social intercourse between individuals and peoples. (See Standard Dictionary, 'Commerce.') This enlarged signification was early in our national history imparted to the term 'commerce' by Chief Justice Marshall, in the leading case of *Gibbons* v. *Ogden*, 22 U.S. (9 Wheat.) 1 [6 L.Ed. 23, see, also, Rose's U.S. Notes], when, in defining the term as employed in our federal constitution, he said: 'Commerce undoubtedly is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations and parts of nations in all its branches and is regulated by prescribing rules for carrying on that intercourse.' This enlarged meaning of the term 'commerce' has been adopted and carried down through a long line of later decisions of both federal and state tribunals and has been applied to many and varied occupations. In the case of *Welton* v. *Missouri*, 91 U.S. 280 [23 L.Ed. 347, see, also, Rose's U.S. Notes], the supreme court said: 'Commerce is a term of the largest import. It comprehends intercourse for the purposes of trade in any and all its forms, including the transportation, purchase, sale and exchange of commodities between the citizens of our country and the citizens or subjects of foreign countries and between the citizens of different states.' "

[11]Statutes of 1962, First Extraordinary Session, chapter 67, section 87; Statutes of 1963, Regular Session, chapter 673, section 40.

obtained information about the patent. He thereafter searched for the devisees, heirs and ultimate successors in interest of the patentee. He discovered his co-plaintiffs, who then probably learned for the first time of the existence of TLS 17 and its location on the ground.

It is also argued that State has been guilty of laches in not seeking a timely determination that the predecessors in interest of plaintiffs had no rights under the patent issued to Nash; and that in consequence State and its political subdivision may not assert laches against plaintiffs.

The defense of laches is based in part upon the deaths of many of the engineers who had made surveys of the tidelands in the area, and of other persons who might have had knowledge about the conditions in National City in about 1870.

Since we reject the claim the right to bring action did not exist until the adoption of Public Resources Code section 6463 in 1963, the attack upon the defense of laches based upon that claim may not be sustained.

The argument State had an obligation equal to that of plaintiffs to seek a judicial decision of the questions involved and should not be permitted to urge the defense of laches overlooks the fact it is not State but Chula Vista whose improvements and commitments gave rise to equities in its favor. As to it the judgment is final.

Finally, since the bar of limitations has arisen, the findings on laches are not necessary to support the judgment.

The judgment is affirmed.

Brown (Gerald), P. J., and Cologne, J., concurred.