[L. A. No. 3060.  In Bank.—December 20, 1913.]

THE PEOPLE, upon Information of U. S. Webb, Attorney-General, Respondent, v. CALIFORNIA FISH COMPANY, CRESCENT WHARF AND WAREHOUSE COMPANY, and SOUTHERN CALIFORNIA LUMBER COMPANY, Appellants.

TIDE LANDS—PUBLIC USES—NAVIGATION AND FISHERY.—The tide lands are, and from the beginning of our government have been, dedicated to public use for purposes of navigation and fishery.

ID.—TITLE VESTED IN STATE IN TRUST FOR PUBLIC USES—ADMINISTRATION OF TRUST.—The title to these lands is, by the people, vested in the state in trust for said public uses.  The administration and execution of this trust is committed by the constitution to the legislative department, subject · to certain expressed reservations and restrictions.

ID.—POWERS OF STATE AS TRUSTEE.—The powers of the state as trustee are not expressed.  They are commensurate with the duties of the trust.  Every trustee has the implied power to do everything necessary to the execution and administration of the trust.

ID.—DISPOSITION OF LAND BY STATE—LAND CUT OFF FROM NAVIGABLE WATERS—EXCLUSION FROM DEDICATION TO PUBLIC USES.—As the state has the powers necessary to the execution and administration of the trust, it follows that it may dispose of these lands in the administration of the trust in such manner as the interests of navigation may require.  One of the duties of the trust is to adapt the land to the use for navigation in the best manner.  If, in so adapting the tide lands for this use, it is found necessary or advisable, in aid of the use, to cut off portions of it from access to navigable water, so that they become unavailable for navigation, the state has power to exclude such portions from the public use and, to that extent, revoke the original dedication.

ID.—EXCLUDED LAND MAY BECOME PROPRIETARY—ALIENATION FOR PRIVATE USE.—When this has been done in the regular administration of the trust, the land thus excluded from use for navigation may become proprietary land, not subject to the public use, and it may then be alienated irrevocably by the state for private use to private individuals.

ID.—EFFECT OF EXCLUSION FROM PUBLIC USE BY STATE—CONSTRUCTION OF STATUTES AUTHORIZING.—When the state, in the exercise of its discretion as trustee, has decided that portions of the tide land should be thus excluded from navigation and sold to private use,

its determination is conclusive upon the courts; but statutes pur-
porting to authorize an abandonment of such public use will be
carefully scanned to ascertain whether or not such was the legisla-
tive intention, and that intent must be clearly expressed or neces-
sarily implied. It will not be implied if any other inference is
reasonably possible. And if any interpretation of the statute is
reasonably possible which would not involve a destruction of the
public use or an intention to terminate it in violation of the trust,
the courts will give the statute such interpretation.

ID.—CONSTRUCTION OF CODE PROVISIONS AUTHORIZING SALE OF SWAMP
AND TIDE LANDS—TIDE LANDS SOLD SUBJECT TO PUBLIC EASEMENTS
—PURCHASER ONLY ACQUIRES NAKED TITLE TO SOIL.—The pro-
visions of the Political Code, sections 3440 to 3493½ inclusive,
authorizing the sale of the swamp and tide lands, show clearly that
they were enacted without any consideration of the interests or
necessities of navigation over tide lands, that they were not intended
as an exercise of the power of administering the public trust upon
which the state holds the tide land, that they were not enacted in
pursuance of a legislative determination that such lands were not
necessary for navigation, or as a decision that the interests of
navigation required that they be excluded from the public use, or
in the interest of navigation. Properly construed, they merely au-
thorize the sale of such land subject to the public easements, the
purchaser to be without authority to interfere with such use,
or with the further administration thereof by or on behalf of the
state. The holder of a patent from the state under these laws will
have the naked title to the soil, subject to the public easements.

ID.—CONSTITUTIONAL LIMITATIONS ON POWER TO SELL TIDE LANDS ON
NAVIGABLE WATERS—PATENTS SUBJECT TO CONSTITUTIONAL RE-
STRICTIONS—RIGHT OF STATE TO IMPROVE FOR NAVIGATION—
IMPROVEMENT OF WATER-FRONT.—Section 2 of article XV of the
present state constitution deprives the legislature of power to dis-
pose of the tide lands fronting upon navigable water so as to
entitle the grantee to destroy or interfere with the public easement
for navigation. It also to that extent repeals all laws which there-
tofore may have purported to authorize such alienation. Where no
payment of purchase money to the state for any tide land is made
until after the adoption of the constitution in 1879, the patent for
such tide land is subject to the constitutional restriction and does
not deprive the state of its power as sovereign trustee to adapt
and improve the land for navigation as it may see fit. This pro-
vision, however, does not deprive the legislature of power to im-
prove the water-front and irrevocably alienate such tide land as
may thereby be rendered inaccessible and useless for navigation.

ID.—JUDGMENT BASED ON PATENTS—PROVISION DEFINING RIGHTS OF
PATENTEE—SUBORDINATION OF TITLE TO PUBLIC EASEMENTS—

CLXVI Cal.—37

RIGHT OF STATE TO ADMINISTER FOR PURPOSES OF NAVIGATION AND COMMERCE.—If any part of the tide land in controversy was open to sale when the sales thereof were made, the proper judgment would be that the defendants claiming under such patents own the soil, subject to the easement of the public for the public uses of navigation and commerce, and to the right of the state, as administrator and controller of these public uses and the public trust therefor, to enter upon and possess the same for the preservation and advancement of the public uses and to make such changes and improvements as may be deemed advisable for those purposes.

ID.—STATE CANNOT RETAKE ABSOLUTE TITLE TO LAND SOLD WITHOUT COMPENSATION—ABANDONMENT OF PUBLIC EASEMENT INURES TO BENEFIT OF PURCHASER—USE OF LAND BY PURCHASER PRIOR TO IMPROVEMENT BY STATE.—If the state has sold tide lands subject to the public easement, prior to making improvements thereon for navigation, as it may do, it cannot, upon putting in force a plan for the subsequent improvement thereof, retake the absolute title without compensation. The purchaser will continue to hold the servient estate, after as well as before the improvement, and if at any time the public easement and use is lawfully and permanently abandoned, the purchaser will then have the absolute and complete estate in the land. And before any such improvement is made by the state, he may use the property as he sees fit, subject to the power of the state to abate any nuisance he may create thereon, and to remove any purpresture he may erect thereon.

ID.—FIXING OF HARBOR LINES BY FEDERAL AUTHORITY—EFFECT ON RIGHTS OF STATE TO MAKE IMPROVEMENTS.—The fixing by the United States of harbor lines is the equivalent of a license to the state to fill in the land between them and the shore, either before or after the erection of a wall on the established line. Until such a sea-wall is actually made, the state may improve for navigation the space between such established line for the wall and the shore, by wharves or other structures within the line.

ID.—SAN PEDRO OR WILMINGTON HARBOR—FEDERAL ESTABLISHMENT OF PIERHEAD AND BULKHEAD LINES—EFFECT ON EASEMENT FOR NAVIGATION OVER INTERMEDIATE LANDS.—The mere establishment, on July, 29, 1908, by authorized officers of the United States, in Wilmington Bay, otherwise known as the inner harbor of San Pedro, of certain lines as pierhead and bulkhead lines for said harbor, did not have the effect to divest the public of its easement for navigation over the lands between the lines and the shore, and to release the same to private use. The fixing of the bulkhead line, or the erection of a sea-wall, does not contemplate the discontinuance or vacation of the public use of all the lands inside the line or wall. Space within the pierhead line must be reserved for docks and slips,

and space inside the wall may be, and usually is, required for wharves, landings, and approaches.

ID.—AUTHORITY OF UNITED STATES AND STATE TO FIX HARBOR LINES—SUBORDINATE AUTHORITY OF STATE TO CONTROL TIDE LANDS.—In cases of conflict, the United States is the superior power in the matter of fixing harbor lines, so far as interstate or foreign navigation and commerce is concerned. But its paramount power does not destroy the concurrent and subordinate power and authority of the state to regulate and control tide lands and waters in the interest of navigation. Each state may freely do so, and may fix other harbor lines differing from those of the federal authority, so long as they do not interfere with the regulations and improvements of the United States made in furtherance of interstate and foreign commerce.

ID.—SALE OF TIDE LANDS BELOW LOW TIDE NOT AUTHORIZED—PATENTS THERETO CONVEY NO TITLE.—The tide land laws in the Political Code do not authorize a sale of land below low tide in any case. So far as patents from the state embrace such land, they convey no title whatever, the officers who executed them being without power under such statutes to sell or convey lands of that character.

ID.—ACT OF 1893 RATIFYING SALE OF SWAMP LANDS—NOT APPLICABLE TO TIDE LANDS.—Section 8 of the act of 1893 (Stats. 1893, p. 341), now incorporated into the Political Code as section 3493s, to the effect that all uncanceled certificates and patents for swamp and overflowed lands, belonging to any of the classes described in section one of the act (Pol. Code, sec. 3493m), are for all purposes valid, has no application to tide lands.

ID.—ACT APPLIES ONLY TO SALES OF UNSEGREGATED SWAMP LANDS.—Upon construing sections 3493m and 3493s of the Political Code together, the validating clause of section 3493s, purporting to validate all previously issued patents for "any lands as swamp and overflowed lands which belonged to any of the classes described in section 3493m whether or not such lands were segregated or sectionized," must be held to apply only to unsegregated swamp lands, such as those uncovered by the recession of the waters of Tulare Lake, for which patents or certificates may have issued, and that it was not intended by the legislature to embrace the segregated swamp lands throughout the state.

ID.—ESTOPPEL OF STATE TO QUESTION VALIDITY OF SALE OF TIDE LANDS.—As to tide lands sold by the state which were reserved from sale, no estoppel against the state to claim title could arise from the mere payment of the purchase money and the failure of the state to return it. Nor could such an estoppel arise as to lands not reserved, as the patentees thereof, who must be presumed to have bought with knowledge of the law on the subject, have received a consideration for their money in acquiring title to the soil.

ID.—TIDE LAND SITUATED WITHIN TWO MILES OF INCORPORATED TOWN—PROHIBITION ON SALE—DISINCORPORATION OF TOWN PRIOR TO ACTION ON APPLICATION TO PURCHASE—SUBSEQUENT APPROVAL OF APPLICATION.—The fact that at the time the application and affidavit for purchase of certain tide land were filed the land was situated within two miles of a then existing incorporated town, and was withheld from sale to private persons by reason of the inhibitions contained in section 3 of article XV of the constitution of 1879, and in section 3488 of the Political Code, did not affect the validity of the location, if the approval by the surveyor general, and all other proceedings were after the repeal of the act incorporating the town and its consequent destruction as a municipal corporation.

ID.—MUNICIPAL CORPORATION—CREATION OF UNDER CONSTITUTION OF 1849—CONSENT OF INHABITANTS UNNECESSARY.—The creation of a municipal corporation is a legislative act, and under article IV of the state constitution of 1849, the legislature had the power, without limitations or conditions, to create municipal corporations at will, by special laws. It follows that a given territory could be incorporated by it as a municipal corporation without the consent or the acceptance of the inhabitants thereof.

ID.—TOWN OF WILMINGTON—INCORPORATION UNDER ACT OF 1872—CONTINUANCE OF INCORPORATION UNTIL REPEAL OF ACT—FAILURE TO ORGANIZE TOWN GOVERNMENT—TIDE LANDS WITHIN TWO MILES OF TOWN WITHDRAWN FROM SALE.—The town of Wilmington, as delimited by the act of February 20, 1872, purporting to create and incorporate it, (Stats. 1871-2, p. 108), notwithstanding the failure of its citizens to ever organize a town government therein, became and remained an incorporated town from the date of the passage of the act until its repeal on March 12, 1887, (Stats. 1887, p. 108), within the meaning of section 3 of article XV of the constitution of 1879, withholding from grant or sale to private persons all tide lands within two miles of any "incorporated" city or town in this state, and fronting on the waters of any harbor, estuary, bay, or inlet used for the purposes of navigation, and of section 3488 of the Political Code, as it existed prior to 1901, excluding from sale all tide lands or swamp lands within two miles of any "incorporated" city or town.

ID.—DISTINCTION BETWEEN INCORPORATION AND ORGANIZATION OF MUNICIPALITY.—A city or town may be incorporated, within the meaning of that reservation, although not yet organized.

ID.—CONSTRUCTION OF ACT INCORPORATING TOWN OF WILMINGTON—ORGANIZATION NOT A CONDITION PRECEDENT TO CORPORATE STATUS.—There is nothing in the terms of the act incorporating the town of Wilmington which of itself shows a legislative intent that acceptance and organization were to be a condition precedent to the beginning of its *status* as a corporation.

Id.—Patents to Tide Lands Within Two Miles of Wilmington are Void.—Patents to private persons of tide lands in and adjacent to San Pedro or Wilmington Bay, and situated within two miles of the town of Wilmington, which were based on payments made and proceedings taken during the time that such town was a municipal corporation, and while consequently such lands were reserved from sale, were unauthorized and void. '

Id.—Contest Between Adverse Claimants as to Right to Purchase—State not Estopped by Contest.—The fact that the patent to such tide lands was issued after and in pursuance of a land contest in the courts, under section 3414 of the Political Code, as to the right of opposing claimants to purchase the land under the law, does not estop the state from claiming that the land was reserved from sale, or that it was and is dedicated to public use.

Id.—Approval of Application to Purchase Before Repeal of Act—Patent Issued After Repeal is Void.—If the approval of an application and survey for tide land so situated occurred before the act incorporating the town of Wilmington was repealed, and while the sale of the land was unauthorized and prohibited, the patent for the land was void, although it was not issued until after the repeal of such act had removed the restriction and made the subordinate title to the soil open to sale.

Id.—Limitations on Power of Officers to Sell Public Lands.—The rule regarding sales of public lands is that all acts of the administrative officers of the state toward such sale, in respect to the lands which the state has withheld from sale, or which are not yet subject to sale, are absolutely void, for want of power in the officers, and not merely voidable, and no subsequent action by the officers themselves can give validity to the void act or ratify it in any way.

Id.—Reception of Price by Officer in Case of Void Sale—Rights of State not Affected.—A patent for state land, issued by the officers in a case where there has been no valid application or survey approved nor any valid payment of the price is void as against the state. The act of the state officers in receiving the price, being wholly unauthorized and absolutely void as an official act, was of no greater force than the act of one not an officer at least so far as its efficacy to create an equity in the land against the state is concerned. It could not operate to give validity to a patent issued after the restriction was removed.

Id.—Statute of Limitations—Issuance of Void Patent.—The mere issuance of such void patent, without authority and contrary to the constitutional prohibition, did not set the statute of limitations in motion against the state in favor of the patentee or his successors in interest.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order refusing a new trial. Walter Bordwell, Judge.

The facts are stated in the opinion of the court.

Gibson, Dunn & Crutcher, Sheldon Borden, J. W. McKinley, Frank Karr, Ward Chapman, Edward E. Bacon, and W. R. Millar, for Appellants.

John Jewett Earle, Edward W. Engs, and Titus, Creed & Dall, *Amici Curiae,* in support of appeal.

U. S. Webb, Attorney-General, Anderson & Anderson, John W. Shenk, Leslie R. Hewitt, and A. P. Fleming, for Respondent.

SHAW, J.—The defendants appeal from the judgment and from an order denying their motion for a new trial.

This is one of a series of nine cases begun by the state of California to quiet its title to certain lands embraced in state patents executed to the predecessors in interest of the defendants, under the general statutes authorizing the sale of swamp and overflowed, salt-marsh and tide lands. The lands lie in and adjacent to the bay of San Pedro, also known as Wilmington Bay. The other cases are numbered, respectively, on our Los Angeles register, as No. 3056, No. 3057, No. 3058, No. 3059, No. 3061, No. 3077, No. 3078, and No. 3079. All of these cases were submitted at the same time. The tracts involved in the series of cases, except one, were sold as tide lands. The one exception involves the land embraced in No. 3077, and was sold as swamp land. We take up the present case, which involves tide land location 132 alone, because it presents the two main questions upon which all of the cases depend, and is free from other questions of importance which may be better treated in connection with the particular case in which they arise. Our discussion and conclusions upon these two principal questions will apply to and control all of the cases. It is conceded that San Pedro Bay is and always has been navigable waters of this state and of the United States. The application and survey for tide land location 132 was approved

on April 21, 1886, payment was made in full on May 4, 1886, the certificate was issued on that day, and a patent was issued on May 31, 1887, to Merick Reynolds, under whom the defendants claim title.

The land has been occupied by the parties defendant and others in privity with them under wharf franchises, and improvements for purposes of navigation have been made thereon in pursuance of said franchises. Those franchises and improvements, by stipulation of the parties, were withdrawn from consideration and were not adjudicated by the court below. Whatever rights the parties may have thereto will remain unaffected by our judgment on the appeals. The superior court gave judgment for the plaintiff, declaring the Reynolds patent void and that the defendants have no interest in the land under it. The tract is all below the line of ordinary high tide.

In speaking of the tide lands in controversy, we are to be understood as referring only to the land lying between the ordinary high and low tide lines. Some of the land involved in some of the cases is submerged land, below the line of ordinary low tide.

The two principal questions mentioned are: 1. The effect of a patent issued under the provisions of the Political Code for the sale of swamp and overflowed, salt-marsh and tide lands, upon the public easement for navigation and fishery and upon the title of the state to the soil; 2. The effect of the act of February 20, 1872, purporting to create the town of Wilmington, to bring into operation certain statutory and constitutional provisions reserving swamp and tide lands from sale.

1. The effect of a patent for tide lands.

These patents were issued under and in pursuance of the laws of the state of California providing for the sale by the state of swamp and overflowed, salt-marsh and tide lands, being article II, chapter 1, title VIII, part III, of the Political Code, embracing sections 3440 to 3493½ inclusive. It is admitted on behalf of plaintiff that the proceedings leading up to and including the issuance of these patents were regular in form and according to the provisions of the law above mentioned in force at the time. The plaintiff claims that the patents to the lands sold as tide lands are invalid because

the land is not and never has been suitable for agriculture, or reclaimable for agricultural purposes, and either lies wholly under navigable waters, or is covered by the water at ordinary high tide, being of that class of land which the state acquired solely by virtue of its sovereignty and held in trust for the public uses of navigation and fishery.

It is a well established proposition that the lands lying between the lines of ordinary high and low tide, as well as that within a bay or harbor and permanently covered by its waters, belong to the state in its sovereign character and are held in trust for the public purposes of navigation and fishery. A public easement and servitude exists over these lands for those purposes. In *Martin* v. *Waddell,* 16 Pet. (41 U. S.) 410, [10 L. Ed. 997], Chief Justice Taney said: ''When the revolution took place, the people of each state became themselves sovereign; and in that character hold the absolute right to all their navigable waters, and the soils under them, for their own common use.'' In *Illinois C. Ry. Co.* v. *Illinois,* 146 U. S. 452, [36 L. Ed. 1018, 13 Sup. Ct. Rep. 118], the court defined this trust as follows: ''It is a title held in trust for the people of the state that they may enjoy the navigation of the waters, carry on commerce over them, and have the liberty of fishing therein freed from the obstruction or interference of private parties. . . . The control of the state for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining.'' In *Ward* v. *Mulford,* 32 Cal. 372, the court said: ''Such land is held by the state in trust and for the benefit of the people. The right of the state is subservient to the public rights of navigation and fishery, and theoretically, at least, the state can make no disposition of them prejudicial to the right of the public to use them for the purposes of navigation and fishery, and whatever disposition she does make of them her grantee takes them upon the same terms upon which she holds them, and, of course, subject to the public rights above mentioned.'' (To the same effect, see *Eldridge* v. *Cowell,* 4 Cal. 87; *Guy* v. *Hermance,* 5 Cal. 74, [63 Am. Dec. 85]; *Lux* v. *Haggin,* 69 Cal. 255, 335, [4 Pac. 919, 10 Pac. 674]; *Oakland* v. *Oakland W. F. Co.,* 118 Cal. 183, [50 Pac. 277];

*People* v. *Kerber,* 152 Cal. 733, [125 Am. St. Rep. 93, 93 Pac. 878] ; *Messenger* v. *Kingsbury,* 158 Cal. 613, [112 Pac. 65] ; *Forestier* v. *Johnson,* 164 Cal. 30, [127 Pac. 156] ; *Shiveley* v. *Bowlby,* 152 U. S. 29, [38 L. Ed. 331, 14 Sup. Ct. Rep. 548] ; *United States* v. *Chandler-Dunbar Co.,* 229 U. S. 53, [57 L. Ed. 1063, 33 Sup. Ct. Rep. 667] ) ; decided by the supreme court of the United States May 26, 1913.

It is also settled that in the administration of this trust when the plan or system of improvement or development adopted by the state for the promotion of navigation and commerce cuts off a part of these tide lands or submerged lands from the public channels, so that they are no longer useful for navigation, the state may thereupon sell and dispose of such excluded lands into private ownership or private uses, thereby destroying the public easement in such portion of the lands and giving them over to the grantee, free from public control and use.   On this subject in *Illinois C. Ry. Co.* v. *Illinois,* 146 U. S. 452, [36 L. Ed. 1018, 13 Sup. Ct. Rep. 118], the court said: ''It is grants of parcels of lands under navigable waters, that may afford the foundation for wharves, piers, docks and other structures in aid of commerce, and grants of parcels which, being occupied, do not substantially impair the public interest in the lands and waters remaining, that are chiefly considered and sustained in the adjudged cases as a valid exercise of legislative power consistently with the trust to the public upon which such lands are held by the state.''   (*Ward* v. *Mulford,* 32 Cal. 372; *Taylor* v. *Underhill,* 40 Cal. 473; *Kimball* v. *Macpherson,* 46 Cal. 107, 108; *Oakland* v. *Oakland W. F. Co.,* 118 Cal. 184, [50 Pac. 277] ; *People* v. *Kerber,* 152 Cal. 733, [125 Am. St. Rep. 93, 93 Pac. 878] ; *Messenger* v. *Kingsbury,* 158 Cal. 613, [112 Pac. 65].) The most striking instance of the exercise of this power of absolute disposition of such tide or submerged lands by the state of California is found in the laws providing for the improvement of the water-front of San Francisco.   By these laws the water-front line was fixed, cutting off from navigation a large area of land which was subject to the daily flux and reflux of the tides and part of the lands always under water, upon which line a sea-wall was constructed, and the area landward of this wall was subsequently surveyed into lots and streets, sold into private ownership and filled in for

private use. This area now constitutes a large portion of the business section of San Francisco. The following cases recognize the authority of the state to make such absolute disposition of these particular lands: *Eldridge* v. *Cowell,* 4 Cal. 87; *Guy* v. *Hermance,* 5 Cal. 74, [63 Am. Dec. 85]; *Hyman* v. *Read,* 13 Cal. 444; *Holladay* v. *Frisbie,* 15 Cal. 634; *Wheeler* v. *Miller,* 16 Cal. 125; *Seabury* v. *Arthur,* 28 Cal. 142; *People* v. *Klumpke,* 41 Cal. 277; *Knight* v. *Haight,* 51 Cal. 171; *Friedman* v. *Nelson,* 53 Cal. 589; *Le Roy* v. *Dunkerly,* 54 Cal. 459; *Knight* v. *Roche,* 56 Cal. 21; *People* v. *Williams,* 64 Cal. 498; *San Francisco* v. *Straut,* 84 Cal. 124, [24 Pac. 814].

In view of these well settled propositions it is obvious that the claim of the plaintiff to the effect that such lands cannot, under any circumstances, be alienated in fee to private parties to the exclusion of the public, cannot be sustained. The main contention of the plaintiff with respect to this and all the other of the series of cases above mentioned, is that the provisions of the Political Code aforesaid, under which the predecessors in interest of the respective defendants obtained such title as the defendants have to the land, were not enacted by the legislature in pursuance of any design to promote, regulate, or control navigation, but were a part of the scheme or system designed for the sale of proprietary lands of the state suitable for reclamation and agriculture, and, hence, that these provisions do not authorize the sale into private ownership of tide lands lying upon a navigable bay and suitable for use in furtherance of navigation, or that, if these laws do authorize the sale of the title to the soil of lands of this character, they were not intended to affect the public rights of navigation or fishery and do not give to the patentee anything more than the title to the soil subject to the aforesaid public rights and uses. The defendants contend that these laws were intended to and do authorize the sale of such lands to private use, that they are, in effect, a decision by the state that the tide lands which its officers may thereafter sell under these laws are unnecessary for navigation or fishery, and that the state's decision thus made in regard to this matter is conclusive. The precise task before us, therefore, is to ascertain whether these statutes were designed merely to authorize the transfer of the title of the soil for such private use as should not interfere with the public rights of navigation and fishery, and

subject always to the public use, or whether the intent was to destroy the public use entirely and convey the land in fee.

We had this question under consideration in the recent case of *Forestier* v. *Johnson,* 164 Cal. 30, [127 Pac. 156]. The plaintiff in that case had purchased from the state, as tide lands, premises embraced in a navigable bay opening into the bay of San Francisco, known as "Fly's Bay." He sued to enjoin the defendants from trespassing thereon by navigating boats over the water for the purpose of hunting and fishing at times when the land was covered with water. The defendants claimed no rights over the land except the right as citizens of the state to exercise the public right of navigation, and while doing so to fish or hunt over the premises. The greater part of the bay was covered and uncovered daily by the tides. The nature of the right asserted by the defendants and their admission as to the title to the soil, made it unnecessary to determine whether or not the patent conveyed such title. The case presented the question whether a patent for tide lands, under these laws, terminated the public right of navigation and fishery over the land embraced therein. It was held that the patent did not terminate these public uses, but merely conveyed to the patentee the title to the soil subject to the public right of navigation and fishery and that the plaintiff was not entitled to enjoin the defendants from exercising these public rights. In this connection the court referred to section 2, of article XV of the constitution, which is as follows: "No individual, partnership, or corporation, claiming or possessing the frontage or tidal lands of a harbor, bay, inlet, estuary, or other navigable water in this state, shall be permitted to exclude the right of way to such water whenever it is required for any public purpose, nor to destroy or obstruct the free navigation of such water; and the legislature shall enact such laws as will give the most liberal construction to this provision, so that access to the navigable waters of this state shall be always attainable for the people thereof." The provisions of the constitution are mandatory and prohibitory. They are binding upon every department of the state government, legislative, executive, and judicial. (Art. I, sec. 22.) All previous laws inconsistent therewith ceased to be effective upon the adoption thereof. (Art. XXII, sec. 1.) The effect of the section above quoted is that, no

matter what effect a subsequent sale of tide lands may have to pass title to the soil of the tidal lands of a navigable bay such as that of San Pedro or Wilmington, it cannot be effective to give the patentee a right to destroy, obstruct, or injuriously affect the public right of navigation in the waters thereof. Since the adoption of that constitution in 1879, if not before, grants of such lands by the state carry, at most, only the title to the soil subject to the public right of navigation. This, of necessity, would save to the state, or its authorized agencies, the right to enter upon such lands and make such erections thereon, or changes therein, as it may find necessary or advisable to adapt the premises for use in navigation, and provide access thereto for that purpose, or in furtherance thereof.

The record in these several cases shows that the purchasers of the tide lands, under whom the defendants claim, paid the purchase money for their respective lands after the constitution of 1879 took effect. The earliest payment made was under tide land location No. 57, covering land involved in L. A. No. 3057, entitled the *People etc.* v. *Banning Co., post,* p. 630, [138 Pac. 100.] The first installment of the purchase money under that location was paid to the state on March 5, 1880. The consequence is, under the authorities about to be cited, that the several purchasers had no vested right in the land, or any enforceable contract against the state for the purchase thereof, at the time the constitution of 1879 took effect. Hence, it follows that, regardless of the question whether the provisions of the Political Code were intended to authorize a sale in fee or not, the sales made under it after the constitution took effect, including those to the predecessors of the defendant, are all impressed with the limitations, reservations, and qualifications imposed by the aforesaid provision, and the estates held by the defendants are subject thereto. In *Messenger* v. *Kingsbury,* 158 Cal. 615, [112 Pac. 67], it is said that "an applicant who has merely filed his affidavit and application to purchase, without paying any part of the purchase price," under the provisions of the Political Code for the sale of tide lands "has no such vested right as will prevent a termination of the opportunity to purchase upon a repeal of the law providing for such sale." (See, also, *Polk* v. *Sleeper,* 158 Cal. 634, [112 Pac. 179], and cases there cited.) The decision in

*Hinckley* v. *Fowler,* 43 Cal. 63, so far as it announces the
rule that the filing of the application creates a contract bind-
ing on the state before any part of the price is paid, must be
considered as overruled by the later decisions.    Upon the same
principle, such applicant had no such vested right as would
prevent the state from altering the conditions of the sale
and adding a reservation withholding a part of the estate
previously offered, so that the purchaser who thereafter com-
pleted a sale, under a previous application, but without
previous payment, would take the title of the state, subject
to such restrictions, limitations, and reservations as the state
had determined to insert in the mean time.    This principle
has often been decided and is thoroughly established by the
cases referred to in the opinion in the Messenger case.
(*Eckart* v. *Campbell,* 39 Cal. 256; *Johnson* v. *Squires,* 55 Cal.
103; *Dillon* v. *Saloude,* 68 Cal. 267, [9 Pac. 162]; *Urton* v.
*Wilson,* 65 Cal. 11, [2 Pac. 411]; *Mosely* v. *Torrence,* 71 Cal.
318, [12 Pac. 430]; *Manley* v. *Cunningham,* 72 Cal. 236, [13
Pac. 622]; *Klauber* v. *Higgins,* 117 Cal. 451, [49 Pac. 466].)
The necessary conclusion from these authorities and these
facts is that the defendants, as against the state of California,
do not hold the entire title and interest in the tide lands, but
that their respective estates in such land, if any they have,
are each subject to the easement and servitude of the public
for purposes of navigation and for commerce by means of
navigation, and to the public right of free access to the
navigable waters over the frontage, whenever it is necessary
for such public purpose.

The same conclusion follows from a consideration of the
provisions of the Political Code, apart from the effect of the
constitution thereon.    We so held in *Forestier* v. *Johnson,* 164
Cal. 30, [127 Pac. 156].    Owing to the much greater interests
here involved, and the much more elaborate argument in the
present cases, we think it proper to treat the subject further.
The dates and pages of the official volumes where are found
the previous statutes out of which grew the provisions of the
Political Code relating to the sale of swamp and overflowed,
salt-marsh and tide lands are as follows: Act of April 28,
1855, Stats. 1855, p. 189; Act of April 21, 1858, Stats. 1858,
p. 198; amending Act of 1859, Stats. 1859, p. 340; amending
and confirming Act of May 14, 1861, Stats 1861, p. 363;

Act of May 13, 1861, the first provision for reclamation districts, Stats. 1861, p. 355; Act of April 27, 1863, providing a general scheme for the sale of all state lands, including the swamp and overflowed and all other proprietary lands and also the tide lands, Stats. 1863, p. 591; Act for the reclamation of salt-marsh and tide lands, April 27, 1863, Stats. 1863, p. 684; revising Act of March 28, 1868, embracing all classes of land belonging to the state, and repealing all other laws on the subject, Stats. 1867–68, p. 507; Act of March 27, 1872, legalizing sales and patents of swamp and overflowed, salt-marsh and tide lands where mistake had been made in designating the class of land, Stats. 1871–72, p. 622.

But although the above cited acts show that the sale of tide lands was authorized by the various statutes, enacted after 1859, it is apparent from their provisions that it was not done in the interest of navigation, or with any reference whatever to navigation. The only provision having any tendency to protect or preserve the public easement for navigation, prior to the year 1870, consisted of reservations of lands in and within a specified distance of certain cities, and thereafter and until 1901, of lands within five miles of named cities and within two miles of all other incorporated towns and cities. From and after 1901 the statute reserved tide lands only, within those limits. These reservations, prior to 1901, applied to swamp and overflowed lands as well as tide lands. The purpose of the reservations was not stated in any of the statutes. As they applied, prior to 1901, to both swamp lands and tide lands, the former of which was not held in trust by the state for navigation, but was proprietary land, for the most part far from navigable water, it is clear that even the reservations made were not solely in the interest of navigation.

There has never been any provision regarding navigation in any of these statutes, and no inquiry or determination on the subject, or in reference to it, was authorized. No board or officer was given any discretion or authority to ascertain whether any land applied for was or was not required for purposes of navigation, or what effect their reclamation or use for private purposes would have upon navigation and commerce. The surveyor general's approval of the application and survey was necessary. But this requirement applied

only to the form of the survey and application and the qualifications of the applicant. It did not empower him to reject the application on the ground that the land was not suitable for cultivation, or that it was needed for navigation, or that its sale to private use would interfere with or destroy the public easement to which such land is dedicated. The applicant determined what land he desired to buy, he caused it to be surveyed if that had not already been done, he made his application and, if he was a person qualified to buy and his proceedings were regular in form, he thereupon became entitled to complete the purchase and could compel the officers of the state to execute the title papers necessary to convey it to him, on payment of the fixed price of one dollar an acre.

The tide lands embraced in these statutes, under the generally accepted meaning of that term, includes the entire sea beach from the Oregon line to Mexico and the shores of every bay, inlet, estuary, and navigable stream as far up as tide water goes and until it meets the lands made swampy by the overflow and seepage of fresh water streams. It is not to be assumed that the state, which is bound by the public trust to protect and preserve this public easement and use, should have intentionally abdicated the trust as to all land not within the very limited areas of the reservations, and should have directed the sale of any and every other part of the land along the shores and beaches to exclusive private use, to the destruction of the paramount public easement, which it was its duty to protect, and for the protection and regulation of which it received its title to such lands.

The history of this legislation on the subject plainly shows that the object of the legislature has been to secure the reclamation of land suitable for agriculture and make it productive. The first statutes, those of 1855 and 1858, with the amendment of 1859, provided only for the sale of swamp lands. These embraced large areas in the interior of the state, situated in the San Joaquin and Sacramento valleys, and extending down to tide water in the bay of San Francisco. There the tide flats in many places merged into them imperceptibly, making it difficult to distinguish between them. The act of May 13, 1861, was the first law providing for reclamation districts. Section 27 of this act declared that it should apply equally to tide lands and swamp lands. No

law at that time authorized the sale of tide lands. The next day, by the act of May 14, 1861, all sales of tide lands made under the swamp land sale acts were ratified and confirmed, and it was also provided that thereafter any unsold tide land could be purchased under the laws for the sale of swamp and overflowed lands, referring to said acts of 1858, and 1859. The inclusion of tide lands in the laws authorizing the sale of swamp lands, thus appears to have been originally due to the fact that some of that class of land had been inadvertently sold by the officers of the state as swamp land. The Reclamation Act of 1861 was superseded by the act of April 27, 1863, (Stats. 1863, p. 684), passed on the same day as the aforesaid act of 1863 for the sale of swamp and tide lands. (Stats. 1863, p. 591.) Both of these acts classified the tide lands with the swamp lands. Ever since 1863, the acts, including the code, have provided for the sale of swamp land and tide lands by the same procedure, and have also provided for reclamation thereof by means of public reclamation districts. The act of Congress donating the swamp land to the state, declared the purpose to be to enable the state "to construct the necessary levees and drains to reclaim" such lands, and the donation was made because the lands were unfit for cultivation in their natural condition. (9 U. S. Stats. 519.) While it thus appears that the object of the statutes has been the sale of these lands in order that they might be reclaimed and devoted to agriculture, no provision whatever was made for the separation of tide lands fit only for reclamation and agriculture and never covered by waters which could be deemed navigable, from those situated on the shore of navigable bays and rivers and on the sea beaches. This apparent neglect and failure even to mention the paramount interests of navigation shows that there was no intention to deal with that subject or to affect the public easement for that purpose.

There is also a rule of statutory construction leading to the same conclusion. A statute will not be construed to impair or limit the sovereign power of the state to act in its governmental capacity and perform its governmental functions in behalf of the public in general, unless such intent clearly appears. "The state is not bound by general words in a statute, which would operate to trench upon its sovereign rights, injuriously affect its capacity to perform its functions, or es-

tablish a right against it." (*Mayrhofer* v. *Board,* 89 Cal.
112, [23 Am. St. Rep. 451, 26 Pac. 646].) This case decides
that a public school house is not lienable under the Me-
chanics' Lien Law applying to "property" generally, and
without express limitation. For further illustration, it has
been held that the state cannot be sued, under section 1050
of the Code of Civil Procedure, giving a right of action "by
one person against another" in certain cases (*Whittaker* v.
*Tuolumne,* 96 Cal. 101, [30 Pac. 1016]) ; that a school district
cannot be garnisheed as a "person" owing the judgment
debtor, under section 542 of the Code of Civil Procedure.
(*Skelly* v. *School Dist.,* 103 Cal. 655, [37 Pac. 643]) ; that a
school house is not subject to assessment for street work, al-
though the language of the statute would include its property
(*Witter* v. *School Dist.,* 121 Cal. 351, [66 Am. St. Rep. 33,
53 Pac. 905]) ; that the state is not bound by a statute of
limitations purporting to apply "in all cases." (*Russ* v.
*Crichton,* 117 Cal. 695, [49 Pac. 1043].) In *Oakland* v. *Oak-
land W. F. Co.,* 118 Cal. 183, [50 Pac. 285], the court says:
"The several states hold and own the lands covered by navi-
gable waters within their respective boundaries in their
sovereign capacity, and primarily for the purpose of preserv-
ing and improving the public rights of navigation and fishery.
They have in them a double right, a *jus publicum* and a *jus
privatum.* The former pertains to their political power—
their sovereign dominion, and cannot be irrevocably alienated
or materially impaired. The latter is proprietary and the
subject of private ownership, but it is alienable only in strict
subordination to the former. No grant of lands covered by
navigable waters can be made which will impair the power of
a subsequent· legislature to regulate the enjoyment of the
public right. The grantee takes the mere proprietary inter-
est in the soil, and holds it subject to the public easement."
We take it that the court in the last sentence was speaking of
grants of tide lands made before the public easement had
been discontinued and abandoned by an improvement in the
interest of navigation leaving it remote from the water-front
and useless for navigation. Where a grant of land not thus
separated is authorized by statute, and no reference is made
to the matter of navigation, under the rule above stated the
proper construction of the statute is that it was intended only

to dispose of the *jus privatum,* leaving the public easement unimpaired and unaffected, subject to the future control and regulation of the state.

As stated in *Forestier* v. *Johnson,* 164 Cal. 30, [127 Pac. 156], the decisions heretofore made by this court hold that these statutes do not allow the alienation of tide lands free from the public easement. In *Taylor* v. *Underhill,* 40 Cal. 473, the court said that even if the title of the state should pass to the buyer, upon a sale under the act of 1868, "it would not authorize him to change the water-front or obstruct navigation"; that a sale to authorize such change "must be done in the interest of commerce," and, in effect, that the advisability of such change "must first be determined by the legislature"; and that no such right "passes to the purchaser under the laws for the sale of swamp and overflowed land." The only law existing at that time for the sale of tide land was that classing it with swamp and overflowed land. In *People* v. *Russ,* 132 Cal. 102, [64 Pac. 111], the court said, referring to the rights of the owner of lands bought of the state under the provisions of the Political Code under consideration: "The right of the public in the use of a stream, as a public highway, is paramount to any right which the owner of the land has to reclaim his land from overflow." These decisions support our construction.

Other decisions go further and declare that these laws do not apply to tide lands situated on the shores of the ocean between high and low tide lines and that a patent for such land conveys no title to the patentee. (*People* v. *Morrill,* 26 Cal. 336; *Kimball* v. *Macpherson,* 46 Cal. 103; *People* v. *Cowell,* 60 Cal. 400; *Upham* v. *Hosking,* 62 Cal. 255.) It was upon these decisions that the court below predicated its conclusion that the defendants had no title to the lands in controversy. In view of the very plain language of the statutes describing tide lands among those authorized to be sold, we do not feel that we can follow these decisions. *People* v. *Morrill,* interpreted the act of May 14, 1861, in connection with the act of 1858 as amended by the act of 1859, applying only to the swamp and overflowed lands. The latter required that the purchaser should make oath that the lands were desired for the purpose of "settlement and reclamation by affiant," and other provisions showed that the reclamation was con-

templated for agricultural purposes. The act of May 14, 1861, confirmed sales of tide lands that had been made under the previous statutes and authorized sales thereafter, under the same statutes, of any unsold tide lands. Under these circumstances the court held that only lands suitable for agriculture were included in the authorization and that there was no authority therein for the sale of tide lands on the ocean beach. The subsequent statutes, of 1863 and after, did not require the applicant to make oath that he desired the lands for settlement and reclamation, and their language plainly embraces all tide lands. This decision is therefore scarcely to be considered as authority for the proposition that the subsequent acts did not authorize the sale of the private right in such tide lands. *Kimball* v. *Macpherson,* and *People* v. *Cowell,* however, give the same construction to the acts of 1863 and 1868, which, in effect, are the same as the Political Code, holding that they did not authorize the sale of tide lands on the shore of the ocean and not susceptible of reclamation for agricultural purposes. *Upham* v. *Hosking* approves the previous decisions on this point, but held that the particular sale there in question was validated by the Curative Act of 1872 (Stats. 1871–2, p. 587.) It involved land in Solano County which was evidently used for purposes of navigation and commerce only. The reason of the decision is not very clearly stated in the opinion. Perhaps the Curative Act was considered as, in effect, a determination by the state that the tide lands which had been applied for up to the date of the act were not necessary for navigation or could be disposed of without detriment to the public easement. These decisions follow the reasoning of the court in *People* v. *Morrill,* without considering the obvious difference between the provisions of the respective statutes. The idea that the state held a double right, private, and public, in these tide lands and that the private right was proprietary, as were the swamp lands with which tide lands were classed, and subject to a similar disposition, and that this disposition might be made subject to the public easement, without injury to the public right, does not seem to have been suggested or considered. No mention is made of the practical difficulty arising from the doctrine declared; that of finding a means of determining where the line should be drawn between the lands authorized to be sold and those not

within the legislative intent. The statutes afford no means for such differentiation. If lands on the sea beach alone were to be considered as excluded, there would be no difficulty. But there are vast bodies of land bordering on the bay of San Francisco and other navigable bays and waters in the state with respect to which the doctrine would produce the utmost confusion and uncertainty. Parts of these lands are as incapable of reclamation as the ocean shore. Other parts might be reclaimed, but would obviously be much more useful for navigation, or would be absolutely necessary at the present time for that purpose. Other extensive areas are obviously useless for navigation and indistinguishable from the swamp lands into which they merge. There are all conceivable varieties of conditions. No line of demarcation or classification is given. No distinction can be made which can be applied with certainty to all locations. The courts would be compelled to legislate, or to declare that all tide lands were included in the authority. The only practicable theory is to hold that all tide land is included, but that the public right was not intended to be divested or affected by a sale of tide lands under these general laws relating alike both to swamp land and tide lands. Our opinion is that these decisions should not be wholly followed; that the buyer of land under these statutes receives the title to the soil, the *jus privatum,* subject to the public right of navigation, and in subordination to the right of the state to take possession and use and improve it for that purpose, as it may deem necessary. In this way the public right will be preserved and the private right of the purchaser will be given as full effect as the public interests will permit. The purchaser will not obtain the absolute ownership, unless the public authorities, by erecting a sea-wall or otherwise improving the premises for navigation, exclude his land or part thereof from the public use and it becomes unnecessary for access or approaches thereto, as in the case of the San Francisco water lots. The public servitude would then be removed from such excluded land.

Our conclusions as to the law on this branch of the case may be summarized as follows:

1. The tide lands are, and from the beginning of our government have been, dedicated to public use for purposes of navigation and fishery.

2. The title to these lands is, by the people, vested in the state in trust for said public uses. The administration and execution of this trust is committed by the constitution to the legislative department, subject to certain expressed reservations and restrictions.

3. The powers of the state as trustee are not expressed. They are commensurate with the duties of the trust. Every trustee has the implied power to do everything necessary to the execution and administration of the trust.

4. As the state has the powers necessary to the execution and administration of the trust, it follows that it may dispose of these lands in the administration of the trust in such manner as the interests of navigation may require. 'One of the duties of the trust is to adapt the land to the use for navigation in the best manner. If, in so adapting the tide lands for this use, it is found necessary or advisable, in aid of the use, to cut off portions of it from access to navigable water, so that they become unavailable for navigation, the state has power to exclude such portions from the public use and, to that extent, revoke the original dedication.

5: When this has been done in the regular administration of the trust, the land thus excluded from use for navigation may become proprietary land, not subject to the public use, and it may then be alienated irrevocably by the state for private use to private individuals.

6. When the state, in the exercise of its discretion as trustee, has decided that portions of the tide land should be thus excluded from navigation and sold to private use, its determination is conclusive upon the courts; but statutes purporting to authorize an abandonment of such public use will be carefully scanned to ascertain whether or not such was the legislative intention, and that intent must be clearly expressed or necessarily implied. It will not be implied if any other inference is reasonably possible. And if any interpretation of the statute is reasonably possible which would not involve a destruction of the public use or an intention to terminate it in violation of the trust, the courts will give the statute such interpretation.

7. The provisions of the Political Code authorizing the sale of the swamp and tide lands show clearly that they were en-

acted without any consideration of the interests or necessities of navigation over tide lands, that they were not intended as an exercise of the power of administering the public trust upon which the state holds the tide land, that they were not enacted in pursuance of a legislative determination that such lands were not necessary for navigation, or as a decision that the interests of navigation required that they be excluded from the public use, or in the interest of navigation. If they had been so intended, they would authorize the alienation of practically all the tide lands without any provision for the protection of the public use and would result in its utter destruction. They can be given some effect if construed to authorize the sale of such land subject to the public easements, the purchaser to be without authority to interfere with such use, or with the further administration thereof by or on behalf of the state. They are reasonably susceptible of that interpretation; hence they will be so construed. The holder of a patent from the state under these laws will have the naked title to the soil.

8. Section 2 of article XV of the state constitution deprives the legislature of power to dispose of the tide lands fronting upon navigable water so as to entitle the grantee to destroy or interfere with the public easement for navigation. It also to that extent repeals all laws which theretofore may have purported to authorize such alienation. No payment of purchase money to the state for any of the tide land in question was made until after the adoption of the constitution in 1879. Hence it is all subject to the restriction just stated. Therefore, regardless of the question of the true construction of the Political Code provisions purporting to authorize the sale of tide lands, the patents under which the several defendants claim tide lands are subject to the constitutional restriction and do not deprive the state of its power as sovereign trustee to adapt and improve these lands for navigation as it may see fit. This provision, however, does not deprive the legislature of power to improve the water-front and irrevocably alienate such tide land as may thereby be rendered inaccessible and useless for navigation.

9. If any part of the tide land in controversy was open to sale when the sales thereof were made, the proper judgment would be that the defendants claiming under such patents own

the soil, subject to the easement of the public for the public uses of navigation and commerce, and to the right of the state, as administrator and controller of these public uses and the public trust therefor, to enter upon and possess the same for the preservation and advancement of the public uses and to make such changes and improvements as may be deemed advisable for those purposes.

It is to be understood, of course, that if the state has sold tide lands subject to the public easement, prior to making improvements thereon for navigation, as it may do, it cannot, upon putting in force a plan for the subsequent improvement thereof, retake the absolute title without compensation. The purchaser will continue to hold the servient estate, after as well as before the improvement, and if at any time the public easement and use is lawfully 'and permanently abandoned, the purchaser will then have the absolute and complete estate in the land. And before any such improvement is made by the state, he may use the property as he sees fit, subject to the power of the state to abate any nuisance he may create thereon, and to remove any purpresture he may erect thereon.

10. With regard to the harbor lines fixed by the United States, it is clear that this is the equivalent of a license to the state to fill in the land between them and the shore, either before or after the erection of a wall on the established line. And until such a sea-wall is actually made, the state may improve for navigation the space between such established line for the wall and the shore, by wharves or other structures within the line.

It appears that on July 29, 1908, the authorized officers of the United States established in Wilmington Bay, otherwise known as the inner harbor of San Pedro, certain lines as pierhead and bulkhead lines for said harbor. A large part of the lands involved lie between these lines and the shore. No seawall, bulkheads, piers, or other improvements have been built on these lines. The defendants claim that the effect of fixing these lines is to divest the public of its easement for navigation over the lands between the lines and the shore, and tc release the same to private use. A similar question was presented in *People* v. *Kerber*, 152 Cal. 733, [125 Am. St. Rep. 93, 93 Pac. 878], with regard to the sea-wall line fixed by state

authority. The court said: "The establishment of a sea-wall line has no effect whatever upon the character of the waters and tide lands between it and the shore as property devoted to use for navigation, at least until some further action is taken looking to the erection of the wall or the abandonment of the public use of the waters between it and the shore." (See, also, *People* v. *Williams,* 64 Cal. 499, [2 Pac. 393].) Moreover, the fixing of the bulkhead line, or the erection of a sea-wall, does not contemplate the discontinuance or vacation of the public use of all the land inside the line or wall. Space within the pierhead line must be reserved for docks and slips, and space inside the wall may be, and usually is, required for wharves, landings, and approaches. The harbor lines in this instance were fixed by the United States, which, in case of conflict, is the superior power, so far as interstate or foreign navigation and commerce is concerned. "Although the title to the shore and submerged soil is in the various states and individual owners under them, it is always subject to the servitude in respect of navigation created in favor of the federal government by the constitution." (*Gibson* v. *United States,* 166 U. S. 272, [41 L. Ed. 996, 17 Sup. Ct. Rep. 579] ; *Gilman* v. *Philadelphia,* 70 U. S. 725, [18 L. Ed. 96] ; *South Carolina* v. *Georgia,* 93 U. S. 9, [23 L. Ed. 782].) But this paramount power of the United States does not destroy the concurrent and subordinate power and authority of the state to regulate and control tide lands and waters in the interest of navigation. Each state may freely do so, and may fix other harbor lines differing from those of the federal authority, so long as they do not interfere with the regulations and improvements of the United States made in furtherance of interstate and foreign commerce. (*Gibbons* v. *Ogden,* 22 U. S. (9 Wheat.) 204, [6 L. Ed. 23].) For the present, therefore, and until the federal authority interferes, the state has the same interest in these lands, and the same power over them, as if the harbor lines had not been fixed by federal authority. The defendants have no right to interfere with this power, or to curtail it, on the ground that the United States may do so in the future.

One of the patents in another of the series of cases (*People* v. *Banning,* L. A. No. 3057, *post,* p. 630, [138 Pac. 100]), being tide land location No. 57, includes within its lines a part

of the. channel leading up to the old Wilmington wharf and embracing land which is and always has been submerged. As we are considering here the main questions involved in all the cases, it is proper to say that the tide land laws do not authorize a sale of land below low tide in any case. So far as such patent, or any other of the patents, embrace such land, they convey no title whatever, the officers who executed them being without power under these statutes to sell or convey lands of that character.

The defendants also claim that their titles are validated and confirmed by section 8 of the act of 1893, now incorporated into the Political Code as section 3493s, to the effect that all uncanceled certificates and patents for swamp and overflowed lands, belonging to any of the classes described in section one of the act (Pol. Code, sec. 3493m), are for all purposes valid. We do not think this statute, either as originally enacted (Stats. 1893, p. 341), or as incorporated in the code, applies to tide land. The description given in the first section is as follows: "lands uncovered by the recession or drainage of the waters of inland lakes, and inuring to the state by virtue of her sovereignty, or the swamp and overflowed lands not segregated by the United States." The title of the original act was, "an act regulating the sale of the lands uncovered by the recession or drainage of the waters of inland lakes, and unsegregated swamp and overflowed lands, and validating sales and surveys heretofore made." No mention is there made of tide lands. They are not included in the subject of the act and it is not to be presumed that the legislature intended to make any provision concerning them. The phrase, "and inuring to the state by virtue of her sovereignty," in the first section, was not intended to designate another distinct class of land, but only to indicate that the first mentioned class included only the lands uncovered by the recession of navigable lakes, since they belong to the state in virtue of her sovereignty, and not to lands beneath unnavigable lakes, which belong to the owners of the adjoining upland. (Civ. Code, sec. 830; *Oakland* v. *Oakland W. F. Co.*, 118 Cal. 183, [50 Pac. 277]; *Shively* v. *Bowlby,* 152 U. S. 31, 42, [38 L. Ed. 331, 14 Sup. Ct. Rep. 548]; *Foss* v. *Johnstone,* 158 Cal. 127, [110 Pac. 294].)

With regard to the swamp lands involved in this action it is to be noted that the validating clause of section 3493s purports to validate all previously issued patents for "any lands as swamp and overflowed lands which belonged to any of the classes described in section thirty-four hundred and ninety three-m, whether or not such lands were segregated or sectionized." The only classes mentioned in the previous section were (1) "lands uncovered by the recession or drainage of inland lakes," (2) "swamp and overflowed lands not segregated by the United States." The insertion of the words "whether segregated or not," in the validating clause, if applied to swamp lands, would seem without meaning, because the only swamp land patents mentioned as validated were those for lands not segregated. Some light is thrown on the meaning by section 3493t, which indicates that some of the uncovered land had been segregated by the United States as swamp and overflowed land prior to the passage of the act and declares that the official plats thereof are to be deemed valid. No authority existed for such segregation as swamp land, if the lake was navigable, since the land would then belong to the state in virtue of its sovereignty, but, owing to the possible doubt as to whether such lakes were navigable or not, the additional words were apparently inserted so as to include patents for uncovered lands, if any, that had been segregated as swamp lands upon the theory that the lakes were not navigable. It is a matter of common knowledge that the act of 1893, afterward incorporated into the code as aforesaid, was passed to provide for the disposition of the land formerly beneath the waters of Tulare Lake and uncovered by its recesssion, much of which had been settled upon and claimed as part of the swamp and overflowed lands. It cannot be claimed, with reason, that this validating clause, intended to confirm such claims, was understood by the legislature to embrace the segregated swamp lands throughout the state. We therefore hold that, with regard to swamp lands, it applies only to unsegregated lands for which patents or certificates may have been issued.

The defendants further claim that the state is estopped to claim title to these lands by reason of the fact that they were purchased for a valuable consideration, which the state has not yet returned or offered to return. This proposition, if it

was otherwise of any force, is answered, as to lands not reserved from sale, by our conclusion that the patents are effective to carry title to the soil. The defendants have received a consideration for their money, and it is to be presumed that they bought with knowledge of the law on the subject. As to lands reserved from sale no estoppel against the state could arise from the mere payment of the purchase money.

2. The other question presented affects the validity of these patents with respect to lands situated within two miles of the corporate limits of the town of Wilmington as fixed by the act of February 20, 1872, purporting to create and incorporate the town of Wilmington. (Stats. 1871–2, p. 108.) The act of April 4, 1870, excluded from sale all land within two miles of "any town or village." (Stats. 1869–70, p. 877.) This act was in force at the time the act incorporating Wilmington was passed. The Political Code was enacted at the legislative session of 1872, the same legislature which incorporated Wilmington. Section 3488 of the Political Code, prior to 1901, excluded from the operation of that article all tide lands or swamp lands within two miles of any incorporated city or town. Section 3 of article XV of the constitution of 1879 is as follows: "All tide lands within two miles of any incorporated city or town in this state, and fronting on the waters of any harbor, estuary, bay, or inlet used for the purposes of navigation, shall be withheld from grant or sale to private persons, partnerships, or corporations." All the lands in question front on the bay of San Pedro. The act of 1872, incorporating Wilmington, was repealed by the legislature on March 12, 1887 (Stats. 1887, pp. 108, 109). If, in point of law, Wilmington was an incorporated town, within the meaning of the above provision of the code and constitution, during the interval between the passage and the repeal of the law, then all proceedings to purchase the lands in question, taken in that interval, would be invalid with respect to land within the two-mile limit. A considerable part of the land involved is affected in this way. The affidavit and application of J. B. Banning for the purchase of tide land location No. 144, involved in L. A. No. 3077, were filed on March 9, 1887, three days before the act of incorporation was repealed, but the application was not

approved by the surveyor general until May 14, 1888, and all
the other proceedings also occurred after the repeal. The
proceedings in tide land locations Nos. 57, 63, 64, 68, and
69, involved in Nos. 3057, 3058, 3059, 3061, 3077, and 3056,
were all taken between the date of the passage of the In-
corporating Act and the date of its repeal.

We do not think that the validity of tide land location No.
144 is affected by the fact that the application and affidavit
therefor were filed with the surveyor general three days before
the repeal of the Incorporating Act. It was not approved
until long after the repeal. It remained on file after the
repeal and until the approval, and the filing may be consid-
ered as having been effective after the approval as well as
before it. Until the approval, it was, at most, a mere un-
accepted offer to purchase. It did not become effective until
it was accepted and approved, and at that time the above
restrictions upon the power of the state officers to make
sales of land had been removed by the repeal of the Incorpo-
rating Act and the consequent destruction of the municipal
corporation. No impediment to the valid disposition of the
soil remained, and no essential part of the proceeding oc-
curred prior to the repeal.

The other of the locations last mentioned, so far as they
embrace land within the two-mile limit, present the question
whether or not Wilmington was an incorporated town within
the restrictions and reservations of the code and the constitu-
tion. Section 1 of the Incorporating Act declares that the
tract of land described, containing two thousand four hun-
dred acres, "shall hereafter constitute the boundaries of and
be known and named the town of Wilmington." Section 2,
so far as material, is as follows: "The government of said
town shall be vested in a board of trustees, to consist of five
members, a town marshal, assesssor and treasurer. Said town
shall be a body politic and corporate by the name and style
of the town of Wilmington, and by that name they and
their successors shall be known in law and have perpetual
succession, and may sue and be sued in all courts and in all
actions whatsoever. . . ." Section 3 provided that the town
officers should be elected by the legal voters of the town on
the first Monday of April of 1872, and on the first Monday

of April of every year thereafter, at an election to be held for that purpose.

Section 4 provided that for the first election the justice of the peace of the township should appoint the election officers, who should proceed to open the polls, receive the votes, and declare the results. It appears from the evidence that at the instance of the township justice fourteen citizens met prior to the election day and nominated candidates for the several offices, but that before the day of election came the general sentiment of the citizens was that the incorporation was a mistake, and they did not vote at the election. No election was ever held, and no person or persons ever acted or assumed to act as officers of the town at any time. The citizens did nothing to organize the town government. Upon these facts the defendants contend that the said town of Wilmington was never incorporated and that it never had a legal corporate existence. The argument is that the state could not erect any territory into a municipal corporation without the consent of the citizens concerned, or a majority of them, and that in the absence of such consent and in the face of a refusal to consent, the attempt to incorporate the town was ineffectual for any purpose. It is also urged that the act of the legislature was a mere proposal for a future incorporation, intended to be of no effect whatever until it was accepted by the citizens and a corporate organization effected, and that by their refusal to accept the corporate franchise or to organize under it, the citizens rejected the proposal and prevented the creation of such proposed municipal corporation.

The Incorporating Act was passed while the constitution of 1849 was in force. The effect of the act depends upon the terms of that constitution. Section 1 of article IV thereof granted all the legislative power of the state to the senate and assembly, constituting the legislature, subject, of course, to such limitations as the constitution elsewhere imposed. Section 31 of the article provided that "Corporations may be formed under general laws, but shall not be created by special acts, except for municipal purposes." Section 37 provided that "It shall be the duty of the legislature to provide for the organization of cities and incorporated villages."

"A municipal corporation is a public institution, created for public purposes; the municipality is a political subdivision or department of the state, governed and regulated, and constituted by public law; . . . the original power to control, as well as to create them, therefore, is in the legislature." (*Payne* v. *Treadwell,* 16 Cal. 233.) "Municipal corporations are but subordinate subdivisions of the state government, which may be created, altered, or abolished, at the will of the legislature." (*San Francisco* v. *Canavan,* 42 Cal. 557.) "A municipal corporation is but a branch of the state government, and is established for the purpose of aiding the legislature in making provision for the wants and welfare of the public within the territory for which it is organized." (*Chico* v. *Supervisors,* 118 Cal. 120, [50 Pac. 276].) The creation of a municipal corporation is therefore a legislative act. The provisions above mentioned gave the legislature the power to create municipal corporations at will; by special laws. No conditions are annexed to the grant of this power. There are no provisions in that constitution to the effect that the consent or acceptance of the inhabitants or citizens of the particular territory should be necessary to give validity to the legislative act, or should be a condition precedent to the creation of a municipal corporation, nor any limitations whatever upon the power to create them. To create, is to bring into being, to cause to exist. The act of creation is not and cannot be complete until the thing is brought into being and exists. The power to create a municipal corporation, therefore, includes the power to bring such corporation into legal existence. As this power was possessed by the legislature without condition or limitation, it must follow that a given territory could be incorporated as a municipal corporation without the consent or the acceptance of the inhabitants thereof. All the authorities sanction this proposition. In *In re Madera Irrigation District,* 92 Cal. 323, [27 Am. St. Rep. 106, 14 L. R. A. 755, 28 Pac. 278], speaking of irrigation districts and after declaring that they were a species of municipal corporations, the court, in argument, remarked: "In the absence of constitutional restriction, it would be competent for the legislature to create such public corporation, even against the will of the inhabitants." (See, also, *People* v. *Ontario,* 148 Cal.

633, [84 Pac. 205]; *In re Sanitary Dist.*, 158 Cal. 457, [111 Pac. 368].) In *Thomason* v. *Ashworth*, 73 Cal. 77, 14 Pac. 617], decided July 2, 1887, the court said: "Prior to the adoption of the present constitution the legislature was not only competent to create a corporation for municipal purposes by a special law, but could compel a community of persons to accept a charter so created." The remarks above quoted are *obiter dicta*, it is true, but they correctly state the prevailing and general rule upon the subject. Mr. Dillon says: "The rule which applies to private corporations, that the Incorporating Act is ineffectual to constitute a corporate body until it is assented to or accepted by the corporators, has no application to statutes creating municipal corporations. These are laws, and, as such, are imperative and binding, according to their terms, without any consent, unless the act is expressly made conditional. . . . And unless otherwise provided by the act itself, or a different intention is manifested, the public corporation is legally constituted as soon as the Incorporating Act declaring it to exist goes into effect." (1 Dillon on Municipal Corporations, 5th ed., sec. 69.) And again: "Public, including municipal, corporations are called into being at the pleasure of the state, and while the state may, and in the case of municipal corporations usually does, it need not, obtain the consent of the people to the locality to be affected. . . . Subject to constitutional limitations presently to be noticed, the power of the legislature over such corporations is supreme and transcendent: it may, where there is no constitutional inhibition, erect, change, divide and even abolish them, at pleasure, as it deems the public good to require." (Ibid. sec. 92.) (See, also, Cooley on Constitutional Limitations, 7th ed. 166; 28 Cyc. 155; 20 Am. & Eng. Ency. of Law, 1130; 1 McQuillin on Municipal Corporations, sec. 153, page 352; 1 Abbott on Municipal Corporations, sec. 25; 1 Smith on Municipal Corporations, sec. 52.) Mr. Andrews in his work on American Law, published in 1907, attacks this doctrine of Mr. Dillon vigorously and declares that not a single case cited by the authors asserting the doctrine supports the proposition. Mr. Andrews perhaps means to say that in his opinion the point was not directly involved in any of the cases cited. Certain it is that practically every one of them declares and affirms

the proposition as stated by Mr. Dillon. And Mr. Dillon himself, in his later and more elaborate edition of 1911, being the work from which the above quotations are taken, repeats the proposition, notwithstanding the criticism of Mr. Andrews. Furthermore, every text writer on the subject declares it to be the law, and the courts of every state, whenever they have had occasion to touch upon the subject, have either declared or recognized the doctrine with respect to the power of creation, to be as stated by Mr. Dillon. The principle appears, moreover, to be the logical sequence from the premises—namely: 1. That the formation of a municipal corporation is a legislative act; 2. That such corporations are agencies of the state for carrying on a part of the local government; 3. That the whole legislative power of the state, including the power to say what territory shall be formed into such corporations for such purposes, is vested in the legislature, so far as it is not limited by the constitution; and, 4. That the constitution of 1849, under which this act was passed, contained no limitations whatever on the power.

It is, of course, unnecessary to decide here that the legislature could have forced the citizens of Wilmington to attend the election and vote for municipal officers or could have compelled them to take up and perform any of the civic duties incident to citizens of such corporation, or to incur municipal debts or liabilities of any character. It may be that legislative power does not include such extreme power over personal liberty of action. The question here presented involves no such proposition. It is a question of the application of a clause reserving land from sale by the state, a reservation made for the benefit of municipal corporations, present and future, and for the preservation of public rights likely to become important to a growing town or city, although of little importance when first incorporated. The reservation in the act of 1870 protected towns and villages, whether incorporated or not. It was superseded by the reservation in the Political Code. It was important that the latter reservation should be effective immediately upon the creation of a municipal corporation without awaiting the organization of the municipal government by the citizens. If this were not so, the reservation would usually be ineffective,

for inasmuch as the state officers were given no power or discretion to refuse to sell tide land regularly applied for, enterprising speculators could, in that case, easily buy up all the water-front after the Incorporating Act and before the organization took place, and the embryo city or town would lose all benefit whatever from the reservation. It may well be assumed that it was for this reason that the reservation was made in favor of municipal corporations which were merely *incorporated*, and was not made to depend on their being organized. The distinction between the incorporation of a municipality and its organization, and the fact that some of them which had been incorporated at the time the constitution of 1879 was adopted, might not then have become organized, was recognized in that constitution. Section 6 of article XI declares that the legislature, by general laws only, may provide for the "incorporation, organization, and classification" of cities and towns, that those heretofore "organized or incorporated" might reorganize under such general laws, and that "cities and towns heretofore or hereafter organized" shall be subject to general laws, except in municipal affairs. Thus, by the latter clause, it implies that a city or town could be incorporated, although not organized, and that the application of general laws, meaning, of course, laws other than those providing for incorporation and organization, should not extend to them until organization took place, in case the general law for incorporation should make it possible for some period of time to intervene between the act of incorporation and that of organization. (See *People* v. *Wilmington*, 151 Cal. 652, [91 Pac. 524].) It is therefore to be presumed that the words of section 3 of article XV, reserving tide lands from sale, were chosen advisedly. They reserve such lands within two miles of any city which has been *incorporated*, whether such incorporation had been followed by organization or not, thus recognizing the distinction made in section 6 of article XI.

From all these considerations we conclude that Wilmington was an incorporated town from the time of the Incorporating Act until its repeal, unless the terms of the act itself show a legislative intent that acceptance and organization were to be a condition precedent to the beginning of its *status* as a corporation. The act contains nothing evincing such an

CLXVI Cal.—39

intent. It is not couched in the form of a proposal to the
inhabitants to form themselves into an incorporated town if
they so desired. Its language is positive and direct to the
effect that the territory described shall hereafter be known
as and constitute the town of Wilmington, and that it "shall
be a body politic and corporate" by that name, with power to
sue and be sued. The following sections constitute a town
charter and describe the powers thereof. Nothing is made
to depend on any acceptance by the inhabitants. The third
section declares the times for holding elections; the fourth
specifies the person to select the election board for the
first election, but neither of them purport to make the hold-
ing of such election necessary to the legal corporate existence
of the town. An incorporated town may legally exist with-
out officers. (*Elliott* v. *Pardee*, 149 Cal. 519, [86 Pac. 1087];
*Swampland District* v. *Silver*, 98 Cal. 54, [32 Pac. 866].)
The corporate existence was declared in the act as an im-
mediate effect, to follow without further condition, upon the
taking effect of the law. The act declares that it shall take
effect from and after its passage. There is no force to the
argument that because the act declares that the territory
"shall *hereafter* constitute" the town and that "said town
*shall* be" a body politic and corporate, it follows as a con-
sequence that the legislature intended it to become such at
some indefinite time in the future or upon the happening of
some future event. No time or future event is specified in
the act. Such language, without qualifying expressions or
provisions indicating a different time, in ordinary usage
means that the effect stated is to take place immediately upon
the declaration thereof, that is, in this instance, from and
after the passage of the act. The incorporation of Wilming-
ton by the act of 1872, therefore, immediately became effect-
ive to put into operation the reservation of lands within two
miles of incorporated cities and towns and make it appli-
cable to lands within that distance of Wilmington. This
reservation continued to apply to all such lands until the
repeal of the act in 1887. The patents based on payments,
all of which were made while the reservation was in force,
and the proceedings taken during that time, were unauthor-
ized and void.

Some of the patents in controversy in this series of cases were issued after and in pursuance of a land contest in the courts, under section 3414 of the Political Code, as to the right of opposing claimants to purchase the land under the law. Such a contest does not estop the state from claiming and showing that the land was reserved, or that it was and is dedicated to public use. The judgment in such a case merely determines which, if either, of the claimants is a qualified purchaser (not whether the law authorizes a sale of the particular land, but which had the better right) and that the one found to be qualified and having the prior claim is entitled to purchase. The state is not a party thereto and public rights are not adjudicated or concluded thereby. (*Polk* v. *Sleeper,* 158 Cal. 637, [112 Pac. 179].)

In the case of tide land location 132, here involved, the approval of the application and survey occurred in 1886, before the act incorporating the town of Wilmington was repealed and while the sale of the land was unauthorized and prohibited by reason of the fact that the land was situated within two miles of the town of Wilmington as incorporated in 1872. The patent in pursuance of said application and payment was not issued until May 31, 1887, more than two months after the repeal of the act incorporating Wilmington had removed the restriction and made the subordinate title to the soil open to sale. The appellants claim that the patent thus issued after the restriction was removed is valid, although all the previous proceedings were forbidden at the time they were had, but they do not argue the point or present authorities to support it. Cases holding that a patent is conclusive against collateral attack are not applicable here. This action is by the state itself, in effect to declare the patent invalid. It is a direct attack, by the party authorized to make it. The rule regarding sales of public lands is that all acts of the administrative officers of the state toward such sale, in respect to the lands which the state has withheld from sale, or which are not yet subject to sale, are void, not merely voidable but absolutely void for want of power in the officers, and no subsequent action by the officers themselves can give validity to the void act or ratify it in any way. (*Doolan* v. *Carr,* 125 U. S. 618, [31 L. Ed. 844, 8 Sup. Ct. Rep. 1228]; *United States Land Assoc.* v. *Knight,* 85 Cal. 485,

[24 Pac. 818] ; *Garfield* v. *Wilson,* 74 Cal. 175, [15 Pac. 620] ; *Wren* v. *Mangan,* 88 Cal. 277, [26 Pac. 100] ; *Buchanan* v. *Nagle,* 88 Cal. 592, [26 Pac. 512] ; *Dewar* v. *Ruiz,* 89 Cal. 387, [26 Pac. 832] ; *Polk* v. *Sleeper,* 143 Cal. 72, [76 Pac. 819].) A patent for state land, issued by the officers in a case where there has been no valid application or survey approved nor any valid payment of the price, is, of course, void as against the state. The act of the state officers in receiving the price, being wholly unauthorized and absolutely void as an official act, was of no greater force than the act of one not an officer, at least so far as its efficacy to create an equity in the land against the state is concerned. It could not operate to give validity to a patent issued after the restriction was removed. The patent might have been ratified and confirmed by the state, but not by the executive officers whose authority to issue patents was limited to cases where the previous proceedings were authorized. The price was one dollar an acre and in this case it amounted to $21.73. If it was turned into the state treasury, as is to be presumed, the state is under a moral obligation to refund it, which it is presumed it will discharge when its attention is properly called to the fact. But the possession of the money by the state treasurer has no legal relation to the title to the land and the moral obligation cannot be made the basis of a lien or claim on the land in favor of the defendants in this action.

In the present case, the period of limitation has not begun to run. The patent, as we have shown, is absolutely void. Its issuance without authority and contrary to the constitutional prohibition did not set the statute in motion. There has been no adverse possession by the defendants. The only occupancy shown was under certain wharf franchises which, with the improvements made in pursuance thereof, are reserved from the operation of the judgment.

The point that at the expiration of such a franchise, or of a railroad permit, the state cannot take such improvements without compensation, does not arise in this or in any other of the cases. Nor do any of them involve the proposition that improvements or structures made on tide lands by a purchaser, on the faith of a patent which grants him only the servient fee, subject to the public easements, may be taken

by the state for purposes of navigation without compensation to him.    Nothing that is said in any of this series of opinions is to be considered as applicable to these questions, or as decisive thereof.

The conclusion we have reached as to tide land location 132 is that the patent is wholly void because of the proximity of the land to the town of Wilmington as incorporated in 1872, and that the judgment of the court below was, in effect, correct.

The judgment and order are affirmed.

Angellotti, J., and Sloss, J., concurred.

BEATTY, C. J., concurring.—I concur in the judgment and generally in what is said in the opinion of Justice Shaw so far as it relates to the questions presented by this particular case—a case which hinges upon the proposition that the patent in question was absolutely void *ab initio*, and under which there was no adverse possession.    Such a case does not call for any extended discussion of the effect of a valid conveyance of tide lands, as to the interest or estate granted or the reserved rights of the public.    As to these matters I prefer to express my views in one of the cases in which the patent cannot be held to have been void, and in which it will be necessary to define the interest acquired by the patentee and the rights reserved to the state.    By this I do not mean to intimate that I find myself very widely at variance with the present opinion, but only that I think that in a few particulars it requires some qualification.